STATE OF CONNECTICUT *v.* JANCIS L. FULLER
. (AC 17328)

Lavery, Landau and Healey, Js.

Argued September 14, 1999—officially released February 15, 2000

*Jancis L. Fuller*, pro se, the appellant (defendant).

*Kevin T. Kane*, state's attorney, with whom, on the brief, was *Lisa Herskowitz*, assistant state's attorney, for the appellee (state).

*Opinion*

HEALEY, J. The defendant, Jancis L. Fuller, was charged in a substitute information in five counts. The first and second counts charged the defendant with attempted murder in violation of General Statutes §§ 53a-49 (a) (2)[1] and 53a-54a.[2] The alleged victims in the first and second counts were Robert C. Leuba and

---

[1] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

Hope Leuba, respectively. The third and fourth counts charged the defendant with attempted assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (5).[3] The alleged victims in the third and fourth counts were Robert C. Leuba and Hope Leuba, respectively. The fifth count charged the defendant with carrying a pistol or revolver on her person without a permit in violation of General Statutes § 29-35 (a).[4] After a trial to a jury, the defendant was found not guilty on the first and second counts but guilty on the third, fourth and fifth counts.[5]

On appeal, the defendant claims that the trial court improperly (1) refused to instruct the jury on certain requested lesser included offenses, (2) refused to grant her motion for judgment of acquittal on the fifth count, (3) admitted chemical evidence of gunshot residue collected from the steering wheel of her car, (4) admitted opinion evidence on the question of whether she committed the alleged crimes and (5) admitted nonexpert opinion about her psychiatric condition. In addition, the defendant claims that the trial judge, *Parker, J.*, was improperly influenced by his professional relationship with Robert C. Leuba.[6] We affirm the judgment of the trial court.

[3] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[4] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

[5] The defendant was sentenced on the third count to twenty years imprisonment with execution suspended after fifteen years, on the fourth count to twenty years with execution suspended after fifteen years and on the fifth count to five years. The sentence on the fourth count was made consecutive to the sentence on the third count. The sentence on the fifth count was made concurrent to the sentence imposed on the third and fourth counts.

[6] At the time of the crimes alleged in the substitute information, Robert C. Leuba was a judge of the Connecticut Superior Court as well as the deputy chief court administrator for the state's judicial branch.

The jury reasonably could have found the following facts. Robert C. Leuba and his wife, Hope Leuba, resided in the Mystic section of Groton since 1960. The defendant's parents lived in that same general neighborhood since 1960. The Leubas had known the defendant since she was young.[7]

On June 29, 1995, the Leubas were awakened at about 4 a.m. by some "thuds" caused by something hitting their house while they were asleep in the second floor bedroom, which is located toward the front of the house. Robert C. Leuba went to the telephone and called 911. Hope Leuba looked out of one of the two bedroom windows and saw "flashes" and heard "popping sounds" coming from the driveway. She saw a "shape" of someone walking down the driveway toward the street. Four spent .32 caliber Smith and Wesson[8] shell casings later were found by the police near the end of the driveway.

Members of the Groton police department arrived within five to ten minutes. The police and Robert C. Leuba found what appeared to be two bullet holes in the front of the Leubas' freshly painted house. One hole was in a clapboard of the front wall over the front porch area adjoining the living room. The other hole was in the exterior front wall of the second floor bedroom and, as Robert C. Leuba described it, "Actually, I think the pillow [that he was sleeping on] is right on the other side of that wall from that hole."[9] The two bullets were removed from the holes. A third bullet hole was found on the sill of the window out of which Hope Leuba had looked when she saw the flashes and heard the gunfire. This bullet completely penetrated the clapboard at an angle, and also penetrated the copper flashing and was

---

[7] The defendant was born on June 22, 1955.

[8] The firearm used in this shooting was never recovered.

[9] The head of the Leubas' bed was located "right up against the wall" that contained the two windows. There was no headboard on that bed.

embedded in what was believed to be a wood surface. Certain marks or "defects" were caused to the recently reshingled roof of the front porch by the bullets as they ricocheted off the roof. Police and forensic personnel, using the two bullet holes near the second floor windows and the "defects," established trajectories of the bullets, which were consistent with the area from which Hope Leuba saw "flashes."

On the morning of June 28, 1995, the defendant attended a pretrial conference on an unrelated criminal matter at the geographical area number ten courthouse in New London. Early that evening, she went to her father's house, accompanied by Robert Rocco and Bennie Leonardi. Thereafter, Leonardi drove the defendant and Rocco to the defendant's and Rocco's West Street apartment in New London, which they shared.

After supper, the defendant went out, having told Rocco that she was going to her father's house to check the mail. She did not go to her father's house, but returned to the apartment between 9 and 9:30 p.m. and went to bed. At approximately 3:30 a.m. the next morning, the defendant told Rocco that she was going out for coffee. Rocco went back to sleep and woke up at about 6 a.m., at which time he checked her room and found her sleeping.

On the afternoon of June 29, 1995, after having interviewed Rocco, Lieutenant Joseph Illinger and Detective Walter Conley of the Groton police located the defendant sitting in her parked car in the parking lot of the New London public library on Huntington Street. Before Conley could say anything to her, she said: "You're here because of the Leubas, aren't you?" Conley said, "Yes." When Conley and Illinger confronted her in the parking lot, information concerning the shooting had not been "out to the media at all." Conley testified that "she immediately went into a tirade of comments about the

Leubas, negative comments, that the Leubas had been persecuting her for twenty years, that Mr. Leuba had hired two men in Providence to break her." Conley further testified that she "appeared very tense, shaking . . . very angry."

After the police officers removed two empty gun holsters from the defendant's car, Conley placed her under arrest. A towing company towed her car to the police department lot, where the steering wheel was swabbed for possible gunshot residue with swabs from an atomic absorption kit. Later, at about 8 p.m. on June 29, 1995, a warrant was executed on the West Street apartment occupied by Rocco and the defendant. While neither a firearm nor ammunition were found in the apartment, a gun cleaning kit was found in a container on the floor underneath the kitchen table.

I

The defendant claims first that the trial court improperly refused to instruct the jury on her two requested lesser included offense charges of reckless endangerment in the second degree pursuant to General Statutes § 53a-64 and attempted assault in the third degree pursuant to General Statutes §§ 53a-49 and 53a-61 (a) (3), which she claims are lesser included offenses of attempted assault in the first degree. Furthermore, she argues that these lesser offenses would have afforded the jury a continuum of subjective culpability within which to view the alleged criminal act and the shooter's intent in relation thereto. Specifically, she claims that the requested lesser included offenses met the second prong of *State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980), which requires that it not be possible to commit the greater offense, as described in the information or bill of particulars, without having first committed the lesser offense. We do not agree.

We note that the state charged the defendant with two counts of attempted murder and two counts of attempted assault in the first degree, with one count of each charge referring to Robert C. Leuba and the other count of each charge referring to Hope Leuba. As pertains to the attempted murder counts, the long form information alleges that the defendant, "with the intent to cause the death" of the Leubas, did attempt to cause death "by means of the discharge of a firearm." With reference to the assault counts, the information alleged that the defendant, "with the intent to cause physical injury to" the Leubas, "did attempt to cause such injury" to them "by means of the discharge of a firearm." She was found not guilty on the attempted murder counts.

A

We first take up the defendant's claim that attempted assault in the third degree is a lesser included offense of attempted assault in the first degree. We do not agree and no discussion of *Whistnant* is necessary to dispose of this part of her claim.

We agree with the state's analysis. Our criminal attempt statute, § 53a-49 (a), requires that a defendant act "with the kind of mental state required for commission of the [particular] crime . . . ." General Statutes § 53a-61 (a) (3) provides in relevant part that a person is guilty of assault in the third degree when, "with criminal negligence, he causes physical injury to another person by means of a deadly weapon . . . [or] a dangerous instrument . . . ." General Statutes § 53a-3 (14) provides in relevant part that "[a] person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. . . ." Applying these statutes, it can be seen that attempted assault in the third degree is not a cognizable offense

because a person cannot, in an attempt to commit assault in the third degree, intend that an unintended injury occur. In *State* v. *Foster*, 202 Conn. 520, 528–29, 522 A.2d 277 (1987), our Supreme Court reasoned that "to be guilty of attempt, a defendant's conscious objective must be to cause the result which would constitute the substantive crime. A person cannot attempt to commit a crime which requires that an unintended result occur . . . because it is logically impossible for one to intend to bring about an unintended result." See *State* v. *Almeda*, 189 Conn. 303, 309, 455 A.2d 1326 (1983), on appeal after remand, 196 Conn. 507, 493 A.2d 890 (1985) (logically impossible to commit crime of attempted involuntary manslaughter because actor would have to intend that unintended death result). Attempted assault in the third degree pursuant to § 53a-61 (a) (3) is not a cognizable offense and is, therefore, not a lesser included offense of attempted assault in the first degree.

B

The defendant also requested that the trial court instruct the jury that reckless endangerment in the second degree pursuant to § 53a-64 (a) was a lesser included crime of assault in the first degree. That statute provides that "[a] person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a risk of physical injury to another person." The trial court denied this request. We agree with the trial court.

Our Supreme Court has "articulated a four-pronged test for determining whether a defendant is entitled to an instruction on a lesser included offense." *State* v. *Preston*, 248 Conn. 472, 476, 728 A.2d 1087 (1999). "A defendant is entitled to an instruction on a lesser offense if, and only if . . . (1) an appropriate instruction is requested by either the state or the defendant;

(2) it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof on the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." (Internal quotation marks omitted.) *State* v. *Manley,* 195 Conn. 567, 574, 489 A.2d 1024 (1985); *State* v. *Whistnant,* supra, 179 Conn. 588.

"In considering whether the defendant has satisfied the requirements set forth in *State* v. *Whistnant,* supra, 179 Conn. 588, we view the evidence in the light most favorable to the defendant's request for a charge on the lesser included offense." (Internal quotation marks omitted.) *State* v. *Tomasko,* 238 Conn. 253, 260–61, 681 A.2d 922 (1996). "[T]he jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested." (Internal quotation marks omitted.) *State* v. *Rasmussen,* 225 Conn. 55, 68, 621 A.2d 728 (1993). "On appeal, an appellate court must reverse a trial court's failure to give the requested instruction if we cannot as a matter of law exclude [the] possibility that the defendant is guilty only of the lesser offense." (Internal quotation marks omitted.) *State* v. *Arena,* 235 Conn. 67, 74, 663 A.2d 972 (1995). "Otherwise the defendant would lose the right to have the jury pass upon every factual issue fairly presented by the evidence." (Internal quotation marks omitted.) *State* v. *Manley,* supra, 195 Conn. 575; *State* v. *Smith,* 185 Conn. 63, 78, 441 A.2d 84 (1981). "These principles do not mean, however, that the evidence must be unrealistically parsed in contra-

vention of how it was presented to and reasonably could have been perceived by the jury." *State* v. *Preston,* supra, 248 Conn. 476–77. "Although there is no constitutional right to have a jury consider possible lesser included offenses, Connecticut law entitles a defendant to a lesser included offense charge if his request satisfies the four requirements set forth in *State* v. *Whistnant* [supra, 588]." *State* v. *Crafts,* 226 Conn. 237, 250, 627 A.2d 877 (1993); *State* v. *Bagley,* 35 Conn. App. 138, 151, 644 A.2d 386, cert. denied, 231 Conn. 913, 648 A.2d 157 (1994).

The defendant's claim is not persuasive because it does not satisfy the second prong of *Whistnant.*[10] That prong requires that it not be possible to commit the greater offense without first having committed the lesser offense. In considering whether that prong is satisfied, " '[t]he court may look only to the information and bill of particulars[11]—as opposed to the evidence presented at trial—to determine what constitutes a lesser included offense . . . .' *State* v. *Troynack,* 174 Conn. 89, 96–97, 384 A.2d 326 (1977)." *State* v. *Rozmyslowicz,* 52 Conn. App. 149, 156, 726 A.2d 142 (1999).

The defendant argues that a narrow reading of the test handed down in *Whistnant,* the seminal decision on this issue, might support the view that the court's refusal to charge on her requested lesser included offenses was proper because it may be possible to attempt to commit murder or assault in the first degree without also being reckless; see *State* v. *Palmer,* 8 Conn. App. 496, 504, 513 A.2d 738, cert. denied, 201 Conn. 808, 515 A.2d 380 (1986); or because a criminal act may not

[10] The state claims that the defendant did not meet the second and fourth conditions of *State* v. *Whistnant,* supra, 179 Conn. 588. Because we determine that the defendant did not meet the second condition, we need not address the fourth condition.

[11] The record before this court does not disclose that a bill of particulars was ever requested.

be both intended and unintended. See *State* v. *Barletta*, 238 Conn. 313, 333–36, 680 A.2d 1284 (1996). Such a construction, she claims, would be at odds not only with a common sense view of the evidence contained in this record but with a line of authorities stemming from *State* v. *Monte*, 131 Conn. 134, 38 A.2d 434 (1944). She also argues that "[f]ortunately, there is a line of authorities, spawned by *State* v. *Rodriguez*, 180 Conn. 382 [429 A.2d 919 (1980)], which supports a construction of *Whistnant* [that] permits a finding of such entitlement [to an instruction on her requested lesser included offense]." She argues in her brief that "*Rodriguez* stands for the proposition that 'an offense that would be a lesser included offense . . . .'[12] Id., 407; see also *State* v. *Smith*, supra, 185 Conn. 63." In addition, the defendant also claims that the "substantial attempt" argument made by her trial counsel rendered *Palmer* and *Barletta* inapplicable. Finally, she claims that the "persuasive" nature of her trial counsel's position makes applicable the so-called "fairness" doctrine "enunciated" in *State* v. *Chance*, 236 Conn. 31, 55, 671 A.2d 323 (1996), where that case refers to *People* v. *Geiger*, 35 Cal. 3d 510, 674 P.2d 1303, 199 Cal. Rptr. 45 (1984).[13] We are not persuaded by any of these claims.

To satisfy the second condition of *Whistnant*, the defendant must show that "it is not possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser." *State* v. *Whistnant*, supra, 179 Conn. 588. "In other words, to require an instruction

---

[12] Although this sentence is unfinished in the defendant's brief, it is apparent that she was referring to the following sentence in *Rodriguez*: "For purposes of the second condition of *Whistnant*, we conclude, however, that an offense that would be a lesser included offense but for its requirement of a less culpable state of mind than that required for the greater, will be deemed a lesser included offense." *State* v. *Rodriguez*, supra, 180 Conn. 407.

[13] The defendant also cites *State* v. *Hinton*, 227 Conn. 301, 630 A.2d 593 (1993).

on a lesser included offense, the lesser offense must not require any element which is not needed to commit the greater offense in the manner alleged in the information or the bill of particulars." *State* v. *Brown*, 163 Conn. 52, 62, 301 A.2d 547 (1972). In *State* v. *Palmer*, supra, 8 Conn. App. 503–504, this court stated that reckless endangerment in the first degree under General Statutes § 53a-63[14] is not a lesser included crime of attempted murder because it is possible to commit the crime of attempted murder without first committing the crime of reckless endangerment in the first degree. Thus, in *Palmer*, the latter crime "was not a necessary step in the progression to the crime of attempted murder as charged in the information." Id., 504. Accordingly, it did not satisfy the second prong of *Whistnant*. Later, in *State* v. *Barletta*, supra, 238 Conn. 335, our Supreme Court stated that "the Appellate Court correctly stated in *State* v. *Palmer*, [supra, 504], [that] it is possible to commit the crime of attempted murder without also committing the offense of reckless endangerment."

In this case, the defendant requested an instruction on reckless endangerment in the second degree.[15] We believe that the reasoning of *Palmer* and *Barletta* controls, even though in this case we are concerned with reckless endangerment in the second degree rather than reckless endangerment in the first degree, which was at issue in *Palmer* and *Barletta*. We agree with the state's argument that just as it is possible to commit attempted murder without creating a risk of *serious* physical injury to another person,[16] it is possible to

---

[11] General Statutes § 53a-63 (a) provides: "A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person."

[15] General Statutes § 53a-64 (a) provides: "A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a risk of physical injury to another person."

[16] See footnote 14.

commit attempted murder without creating a risk of *any* physical injury to another person.[17]

The defendant maintains that *Rodriguez* and *Smith* render *Palmer* and *Barletta* inapplicable. She argues that *Rodriguez* and *Smith* support her claim that she is entitled to an instruction on reckless endangerment in the second degree under the second prong of *Whistnant*. She refers to that part of *Rodriguez* that states that "[f]or purposes of the second condition of *Whistnant*, [the Supreme Court] conclude[s] . . . that an offense that would be a lesser included offense but for its requirement of a less culpable state of mind than that required for the greater, will be deemed a lesser included offense." *State* v. *Rodriguez*, supra, 180 Conn. 407; see *State* v. *Smith*, supra, 185 Conn. 77. *Smith* also iterates that *Rodriguez* "established that in prosecutions for homicides despite the differences between acting intentionally, acting recklessly, and acting with criminal negligence, [the Supreme Court] will deem the more culpable of those mental states to include the less culpable *when both apply to actions with respect to an identical result or circumstance*." (Emphasis added.) *State* v. *Smith*, supra, 75–76. We agree with the state that the defendant's reliance on *Rodriguez* and *Smith* is misplaced because although those cases hold what the defendant claims they hold, the crimes charged in those cases differ from reckless endangerment in the second degree not only as to mental state, but also in terms of a result or circumstance attending the reckless conduct.[18] Although the attempted murder and

---

[17] See footnote 15.

[18] General Statutes § 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ."

attempted assault counts in the substitute information required the circumstance that the defendant discharge a firearm, reckless endangerment has a required result that those offenses do not—the creation of a risk of injury to another person. This amounts to a difference in the elements required and, thus, *Rodriguez* and *Smith* do not support her claim that she was entitled to a charge on reckless endangerment in the second degree.

In this case, reckless endangerment in the second degree is not a necessary step in the progression to the crime of assault in the first degree as charged in the substitute information. As recently as 1996, our Supreme Court stated: "Notwithstanding our limited liberalization of *Whistnant* in *Rodriguez* and *Smith*, we have never abandoned the general rule that one crime is not a lesser included offense of another if the greater can be committed *without a simultaneous commission of the lesser.* See, e.g., *State* v. *Franko*, 199 Conn. 481, 494, 508 A.2d 22 (1986); *State* v. *MacFarlane*, 188 Conn. 542, 548, 450 A.2d 374 (1982)." (Emphasis added.) *State* v. *Barletta*, supra, 238 Conn. 335; see *State* v. *Chance*, supra, 236 Conn. 53–56.

During the trial, the defendant's counsel filed a memorandum of law in which he argued that *Palmer* and *Barletta* "rely on the rather narrow and artificial idea that it is hypothetically possible to attempt murder without actually creating a risk to the victim, based on the doctrine of factual impossibility. Since the present case is alleged as a 'substantial step' attempt rather than a 'factual impossibility' attempt, the second condition in *Whistnant* cannot be reconciled with [the] application of *Barletta* and *Palmer* to the facts of this case."[19] In that memorandum, the defendant's counsel neither

---

[19] Here, the memorandum of law refers to the *dissent* in *State* v. *Palmer*, supra, 8 Conn. App. 506 (*Spallone, J.*, dissenting), which does not control.

cited any authority nor provided any analysis for this distinction, nor did the pro se defendant in her appellate brief. Neither trial counsel nor the defendant on appeal point to anything in *Palmer* or *Barletta* that serves as a basis for the distinction apparently sought to be made.

Although this "substantial step-factual impossibility" theory is presented as an abstract theory, it seems to us that the defendant concedes that when attempt liability is predicated on factual impossibility, reckless endangerment in the second degree is not a lesser included offense. This is so because the defendant's conduct does not create a risk to another person. When attempt liability is predicated on the taking of a substantial step, however, a risk is *necessarily* taken, and then it becomes a lesser included offense.

A person may take a substantial step toward the attempt to murder or injure someone without actually creating a risk of injury to that person even where, as the state argues, there is no factual impossibility. The underlying premise of the defendant's "substantial step" argument is flawed because the taking of a substantial step by means of discharging a firearm did not necessarily create a risk of injury to the Leubas. The jury, as the state correctly argues, could have concluded that there was actually no risk of injury to the Leubas because of the nature of the construction of the Leubas' house, and the nature of the firearm and its ammunition. The jury could find that there was no risk that the bullets could have penetrated the interior of the house to cause injury to either of the Leubas. Under this scenario, there would be a substantial step, but the creation of the risk required would not be present. It seems to us that the statutes defining reckless endangerment try to prevent the risk created by the actor's conduct, not a particular outcome. It is the risk of injury that sustains the prosecution. In this case, it is the discharge of a firearm that must be assessed in determining if the

defendant thereby created a risk of physical injury to another person. The defendant's "substantial step" argument does not avail her.[20] Whether her claimed conduct was a substantial step does not change the analysis, which discloses that reckless endangerment in the second degree includes an element that is not included in assault in the first degree, and, therefore, cannot be a lesser included offense. Moreover, to conclude that reckless endangerment in the second degree is a lesser included offense, which, of course, is not possible under the second condition of *Whistnant*, would have thrust upon the state the additional burden of proving that the defendant's conduct created a risk of injury, an element not included in the greater offense of attempted assault in the first degree.

Finally, we look at the defendant's claim under the so-called "fairness doctrine" referred to in *State* v. *Chance*, supra, 236 Conn. 55, which in turn refers to *People* v. *Geiger*, supra, 35 Cal. 3d 510. *Geiger* held that "fairness" to a defendant, absent "substantial countervailing considerations" for using the conventional rule; id., 526; "requires . . . instructions on *related* but not necessarily included offenses." (Emphasis added.) Id., 530. Therefore, the defendant claims under *Geiger* that she was entitled to an instruction on reckless endangerment in the second degree as a lesser included offense. We do not agree for two separate and distinct reasons.

First, the *Geiger* fairness doctrine requires an instruction "on related but not necessarily included offenses . . . when . . . [1] the lesser offense is closely related to the offense charged; [2] [the] defendant's theory of defense is consistent with a conviction for a related

---

[20] We do not overlook the fact that the substitute information states that the charged crimes were committed by discharging a firearm. Under the second prong of *Whistnant*, we must look only to the information and cannot resort to the evidence. *State* v. *Jacobowitz*, 182 Conn. 585, 593, 438 A.3d 792 (1981); *State* v. *Rozmyslowicz*, supra, 52 Conn. App. 156.

offense; and [3] evidence of the lesser offense exists
. . . ." (Citation omitted; internal quotation marks
omitted.) *State* v. *Chance,* supra, 236 Conn. 55. "The
defendant's plea of not guilty put in issue every essential
element of the [crimes] charged, thus requiring the state
to prove every such element beyond a reasonable
doubt." *State* v. *Kish,* 186 Conn. 757, 763, 443 A.2d 1274
(1982); *State* v. *Griffin,* 175 Conn. 155, 162, 397 A.2d
89 (1978). This included the issue of her identity as the
shooter, which was crucial, if not the core of her defense
posture at trial. On appeal, she chose to include in the
appendix to her brief, over her name and under the
date of "2-4-98,"[21] a document entitled "Statement of
Facts."[22] It is apparent from this "Statement of Facts"
that her theory of defense is inconsistent with a convic-
tion for the related offense under the second prong of
the *Geiger* analysis in that now, on appeal, she admits
that she was at the scene at the time of the shooting
although some unidentified male with her was the
shooter. She, thus, does not even qualify to invoke *Gei-*
*ger,* as she does not satisfy its second condition. We
want to make clear that our reference to this "2-4-98
Statement of Facts" is only for the purpose of discussing

---

[21] The date of the judgment in this case is June 4, 1997. The defendant
appealed from that judgment on June 9, 1997.

[22] The defendant's "Statement of Facts" includes the following: "One of
my friends was the shooter in the 6-29-95 shooting incident. I was the only
eyewitness to it besides him. He did not shoot at the bedroom wall or
window or at the second floor at all. He fired two shots at the far left wall
of the front first floor of the house. He fired a third shot at the porch railing
and the bullet ricocheted off it. A light went on in the far right second floor
window right after the third shot. No one was visible in that or any other
window of the house at any time while we were there. After the light went
on we immediately turned and quickly walked away. I looked back as we
were walking away and still did not see anyone in any window of the house
and I have 20/15 vision. As we walked down the driveway, the shooter fired
one more shot in the direction we were walking. No one saw us leave the
area. . . ." The balance of the "Statement of Facts" does not contain any
more of the facts of the actual episode. It does, however, maintain that the
wrong person, i.e., the defendant, was arrested.

her claim under *Geiger* and does not trespass on any right she had by virtue of exercising her constitutional right not to testify at her trial. Even if the law in Connecticut permitted us to decide her claim under a *Geiger* analysis, it would be rejected.

Second, and more significantly, the defendant's *Geiger* claim requires a "liberalization" of the second condition of *Whistnant*. This we cannot do. It is not within our function as an intermediate appellate court to overrule Supreme Court authority. *D'Arcy* v. *Shugrue*, 5 Conn. App. 12, 29, 496 A.2d 967, cert. dismissed, 197 Conn. 812, 499 A.2d 56, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985). Recently, our Supreme Court stated that "[h]aving previously addressed and rejected claims substantially similar to that raised [here] by the defendant; see *State* v. *Franko*, supra, 199 Conn. 493–95; *State* v. *Castro*, 196 Conn. 421, 426–29, 493 A.2d 223 (1985); *State* v. *MacFarlane*, [supra, 188 Conn. 548]; we are not inclined to reconsider *Whistnant*." *State* v. *Chance*, supra, 236 Conn. 56.

## II

The defendant claims next that the trial court improperly refused to grant her motion for judgment of acquittal on the fifth count, which charged her with carrying a pistol or revolver without a permit in violation of § 29-35 (a). She claims that there was insufficient evidence to prove beyond a reasonable doubt the essential element that the barrel of the firearm involved was less than twelve inches in length. We do not agree.

"In reviewing a claim of insufficiency of the evidence, this court construes the evidence in the light most favorable to sustaining the jury's verdict and will affirm that verdict if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The issue is whether the cumulative effect of the evidence was sufficient to justify the verdict of guilty beyond a

reasonable doubt." (Citation omitted.) *State* v. *Ruscoe*, 212 Conn. 223, 245, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990). "While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. *State* v. *Castonguay*, 218 Conn. 486, 507, 590 A.2d 901 (1991). If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. *State* v. *Grant*, 219 Conn. 596, 604–605, 594 A.2d 459 (1991). . . . *State* v. *Pinnock*, 220 Conn. 765, 770–71, 601 A.2d 521 (1992)." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 678, 613 A.2d 788 (1992). "In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Internal quotation marks omitted.) *State* v. *Avis*, 209 Conn. 290, 309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989); *State* v. *Adams*, 225 Conn. 270, 277, 623 A.2d 42 (1993); *State* v. *Crosby*, 36 Conn. App. 805, 820, 654 A.2d 371, cert. denied, 232 Conn. 921, 656 A.2d 669 (1995). In addition, the jury may use its common sense in assessing the circumstantial evidence to resolve the issue of the gun barrel length. *State* v. *Williams*, 231 Conn. 235, 252, 645 A.2d 999 (1994); *State* v. *Crump*, 43 Conn. App. 252, 259–61, 683 A.2d 402, cert. denied, 239 Conn. 941, 684 A.2d 712 (1996); *State* v. *Crosby*, 36 Conn. App. 805, 821, 654 A.2d 371 (1985). In *State* v. *Williams*, supra, 251–52, our Supreme Court overruled

*State* v. *Brown,* 173 Conn. 254, 377 A.2d 268 (1977), to the extent that it required the state to introduce "direct numerical evidence" of the length of a barrel of a handgun to support a conviction.

It is true that the gun involved was not offered into evidence. This court, however, has upheld a conviction where the requisite gun barrel length was based solely on circumstantial evidence. See *State* v. *Crosby,* supra, 36 Conn. App. 821 (testimony that gun barrel was not as long as twelve inch piece of paper shown to witness). In *State* v. *Perry,* supra, 48 Conn. App. 197–98, this court reversed a conviction of carrying a pistol without a permit because of insufficient evidence in that there was a lack of evidence concerning the gun and the length of its barrel. In doing so, the court said that "[w]hile circumstantial evidence concerning the length of the gun barrel may sustain a conviction under the statute, we are persuaded that some measure of descriptive evidence from which the jury may properly infer the barrel length is necessary in order for the state to satisfy its burden of proof." Id., 198.

We conclude that the evidence on this issue, viewed most favorably to the state, demonstrates that the gun used by the defendant on June 29, 1995, had a barrel that was less than twelve inches in length. The state offered evidence to prove that on May 27, 1983, the defendant purchased a .32 caliber Smith and Wesson Model 31 at a gun shop in Old Lyme. The gun had a three inch barrel. Through the owner of that gun shop, the state offered not only the foregoing evidence, but also the serial number of the specific revolver purchased, which had never been reported as lost or stolen by the defendant since the purchase date. No pistol permit, however, had ever been issued to the defendant by the state of Connecticut, the city of New London or the town of Groton. There was no evidence that the defendant ever owned or had access to any other fire-

arm. The bullets removed from the Leuba house, the rifling characteristics or markings found on these bullets and the shell casings found at the crime scene were all consistent with the particular make and model of the firearm that the defendant had purchased in 1983. These rifling characteristics were consistent with revolvers made by at least six different manufacturers of firearms.[23] One of those firearms was a Model 31 .32 caliber revolver. The holster taken from the defendant's car on June 29, 1995, had impressions and markings, including barrel markings, cylinder markings and trigger guard markings that were consistent with the model of the Smith and Wesson revolver purchased by the defendant in 1983. The brushes from the gun cleaning kit seized from the kitchen of the apartment she shared with Rocco[24] "could be" used for cleaning the type of firearm she owned. Reasonably viewed, the evidence was sufficient to establish that the firearm used by the defendant had a gun barrel less than twelve inches in length. Accordingly, the trial court properly denied the defendant's motion for judgment of acquittal on the fifth count.

### III

Next, the defendant claims that the trial court improperly admitted the results of the chemical testing of residue collected from the steering wheel of her car. She argues that John Collins, the tow truck operator who transported her car from the New London library parking lot to the Groton police department lot, touched and thereby contaminated the residue on the steering wheel prior to its being swabbed by the police. In addition, she maintains that the opinion of the state's expert witness as to the substance on the steering wheel was

---

[23] The six manufacturers were Smith and Wesson, Harrington and Richardson, Iver Johnson, INA, Merwyn and Hubert and Eastern Arms.

[24] Rocco testified that he never owned a gun.

"inconclusive and not given pursuant to our law." We are not persuaded by these arguments.

Our discussion and analysis of this issue requires the recital of additional facts. On the afternoon of June 29, 1995, shortly after finding the defendant in her car in the library parking lot, the police summoned a tow truck operator to that location for the purpose of transporting it to the police department lot. Collins responded and came to the scene. He was told not to touch anything in the car and testified that he was careful not to touch the steering wheel. Collins could not recall whether the car had an automatic or standard transmission, although he did recall that the "shifter was in the middle."

On the night of June 29, 1995, Groton police Detective Donald LaBonte was assigned to do a gunshot residue test on the steering wheel of the defendant's car. The state produced expert testimony to the effect that a person holding and shooting a firearm tends to get gunpowder residue on her hand. The residue resembles "chalk dust" and is a gas cloud formed as the result of discharging the firearm. If a person has this residue on her hand, it can be transferred "to other objects," to "other areas that you are touching." Such residue contains the chemical elements of lead, barium and antimony. LaBonte swabbed the steering wheel with swabs from an atomic absorption kit and sent the swabs in a sealed container to the state police forensic laboratory for testing. Although the elements of lead, barium and antimony are found in the environment, it is "somewhat unique" when all three are found together. According to the state's criminalist expert, Robert O'Brien, finding all three elements together results in a firmer opinion that the substance contains gunshot residue.

With reference to the claim that Collins, the tow truck operator, contaminated the steering wheel, our

Supreme Court has stated that " '[t]here is no hard and fast rule that the prosecution must exclude or disprove all possibility that the article . . . has been tampered with . . . .' *State* v. *Johnson*, 162 Conn. 215, 232, 292 A.2d 903 (1972)." *State* v. *Jeffrey*, 220 Conn. 698, 706, 601 A.2d 993 (1991), cert. denied, 505 U.S. 1224, 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992). "In each case the trial court must satisfy itself that the evidence offered probably has not been changed in important respects." Id. Collins testified that he was careful to obey the orders not to touch the steering wheel. Even though he could not recall exactly what he did, he testified as to what he customarily did, which did not include touching the steering wheel. Such evidence was sufficient to support the trial court's ruling that the steering wheel had probably not been contaminated. Because there was no evidence that the steering wheel probably had been contaminated, if at all, certainly not in any significant manner, there was no abuse of discretion in this ruling.

The defendant also claims that the trial court improperly allowed O'Brien's opinion that the substance swabbed from the steering wheel was gunshot residue. She argues that O'Brien's opinion was "inconclusive and not given pursuant to our law."[25] We do not agree.

[25] The defendant's brief is not helpful here. The only legal authority she cites pertains to the trial court's having sustained an objection to her counsel's question to O'Brien as to whether he believed the substance tested had more than or less than a fifty-fifty chance of being gunshot residue. It is true that our law permits experts to testify as to percentages; *Healy* v. *White*, 173 Conn. 438, 443–44, 378 A.2d 540 (1977); where it can fairly be said to be cast in terms of probability. It is not, however, appropriate for any expert to give an opinion in terms of a "fifty-fifty chance" because such an opinion relates to possibilities rather than probabilities. See, e.g., *Davis* v. *P. Gambardella & Son Cheese Corp.*, 147 Conn. 365, 373, 161 A.2d 583 (1960), distinguished in *Healy* v. *White*, supra, 444. O'Brien said that he could not answer defense counsel's question as asked, i.e., in terms of the a fifty-fifty chance. We conclude that the trial court did not abuse its discretion in sustaining the state's objection.

The evidence on this issue was not "inconclusive," as the defendant claims. Simply put, "inconclusive" evidence is evidence "leading to no conclusion or definite result . . . ." Webster's Third New International Dictionary (1986). The jury reasonably could have found, on the basis of the state's evidence, that the substance from the steering wheel was gunshot residue. The defendant seems to argue that O'Brien's opinion was not admissible because he testified that he could not say, with a reasonable degree of scientific certainty, that it was gunshot residue. He did testify that the presence of lead, barium and antimony, as he found it in testing that substance, was "consistent" with its being gunshot residue. Because this trial took place before our Supreme Court handed down its decision in *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), we are governed by the pre-*Porter* law.[26] Although our Supreme Court has never expressly adopted the *Frye* standard that includes reference to the reliability of the scientific test or procedure involved, it has in effect affirmed that relationship. In *State* v. *Hasan*, 205 Conn.

[26] The defendant's brief does not contain any legal authority for this standard of admissibility for O'Brien's opinion. Despite that, we recognize that in *State* v. *Porter*, supra, 241 Conn. 66–68, "our Supreme Court adopted the more liberal approach of *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), for the admissibility of scientific evidence. . . . As a result, the . . . general acceptance test [of *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923)] is no longer the sole prerequisite to admissibility but, instead, part of a broader conceptual approach. [*State* v. *Porter*, supra, 75–77]." (Citation omitted.) *State* v. *Jones*, 51 Conn. App. 126, 135 n.9, 721 A.2d 903 (1998), cert. denied, 247 Conn. 958, 723 A.2d 814 (1999). In *State* v. *Esposito*, 235 Conn. 802, 670 A.2d 301 (1996), our Supreme Court noted that it had earlier "acknowledged that the 'general acceptance' test set forth in [*Frye*] . . . constituted the prevailing standard for evaluating the admissibility of scientific evidence"; id., 831; but it took care to say, "[w]e did not, however, expressly adopt the *Frye* test as the sole standard . . . and we decline to do so today." Id., 832. Expert testimony, however, need not always have its admissibility determined by the *Frye* standard. See, e.g., *State* v. *Borrelli*, 227 Conn. 153, 164–65, 629 A.2d 1105 (1993); *State* v. *Hasan*, 205 Conn. 485, 490, 534 A.2d 877 (1987).

485, 490, 534 A.2d 877 (1987), our Supreme Court stated that "[t]he fact that a technique or method has gained general acceptance in the scientific community to which it belongs tends to ensure that the jury will not accord undue weight to the theories whose validity have not been adequately tested." A majority of American jurisdictions has held the results of such tests to be admissible evidence in criminal proceedings. See, e.g., *Keith* v. *State*, 612 P.2d 977 (Alaska 1980); *Mills* v. *State*, 476 So. 2d 172 (Fla. 1985); *State* v. *Warden*, 100 Idaho 21, 592 P.2d 836 (1979); *People* v. *Cole*, 170 Ill. App. 3d 912, 524 N.E.2d 926, appeal denied, 122 Ill. 2d 582, 530 N.E.2d 253 (1988); *State* v. *Ulrich*, 187 Mont. 347, 609 P.2d 1218 (1980); *State* v. *Journey*, 201 Neb. 607, 271 N.W.2d 320 (1978); *State* v. *Chatman*, 156 N.J. Super. 35, 383 A.2d 440, cert. denied, 79 N.J. 467, 401 A.2d 224 (1978); *State* v. *Crowder*, 285 N.C. 42, 203 S.E.2d 38 (1974), vacated in part on other grounds, 428 U.S. 903, 96 S. Ct. 3205, 49 L. Ed. 2d 1207 (1976); *Commonwealth* v. *Sangricco*, 475 Pa. 179, 379 A.2d 1342 (1977); *State* v. *McCall*, 698 S.W.2d 643 (Tenn. Crim. App. 1985); *Cordova* v. *State*, 754 S.W.2d 502 (Tex. App. 1988). The weight of authority enhances the reliability of this testimony; it is generally accepted: General acceptance does not require scientific unanimity. *Lindsey* v. *People*, 892 P.2d 281, 289 (Colo. 1995); *People* v. *Dalcollo*, 282 Ill. App. 3d 944, 957, 669 N.E.2d 378, cert. denied, 169 Ill. 2d 575, 675 N.E.2d 635 (1976).

Although O'Brien testified that he could not state his opinion with a reasonable degree of scientific certainty, he did say that the result of his testing was "consistent" with the substance's being gunshot residue. Black's Law Dictionary defines "consistent" to mean "[h]aving agreement with itself or something else; accordant; harmonious; congruous; compatible; compilable; not contradictory." Black's Law Dictionary (6th Ed. 1990). "The test of whether an expert's testimony expresses a rea-

sonable probability is not based upon the semantics of the expert or his or her use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." 31A Am. Jur. 2d 90, Expert and Opinion Evidence § 87 (1989); see *Aspiazu* v. *Orgera*, 205 Conn. 623, 632, 535 A.2d 338 (1987); *Ralph* v. *Mr. Paul's Shoes, Inc.*, 572 S.W.2d 812, 814 (Tex. Civ. App. 1978). A review of all of O'Brien's testimony on this issue, including the wide-ranging cross-examination, leads us to conclude that the trial judge did not abuse his wide discretion in permitting the admission of O'Brien's opinion. In doing so, a fair view of his testimony demonstrates that his opinion was given and admitted with the requisite degree of proof. His opinion was admissible and its weight was for the jury to decide. We therefore cannot accept the defendant's argument on the gunshot residue issue.

## IV

Next, the defendant claims that the trial court improperly overruled her trial counsel's objection to a question by the state on its second redirect[27] of her father, Harvey

---

[27] Harvey Fuller had been presented as a witness by the state. The state had examined him on direct examination, the defendant then cross-examined him, thereafter the state again examined him on redirect, the defendant again cross-examined him and then the state again examined him on redirect examination. It was during the state's last examination of Fuller that the question objected to and the answer given took place.

The specific question and answer involved were as follows:

"[Prosecutor]: And when did you first learn about the shots having been fired at the Leubas?

"A. It was that morning [June 29, 1995] when I got up. There were police cars. I don't remember the time.

"Q. And when you learned about it, did you believe it was she who had done it?

"[Defense Counsel]: Objection.

"The Court: Overruled.

"A. Well, naturally after the scene the night before, yes. I couldn't help the suspicion that that's what had happened.

"Q. Thank you.

"[Defense Counsel]: I ask that that be stricken, opinion testimony.

"The Court: Denied. Questions?

"[Defense Counsel]: No."

Fuller (Fuller), in which he "gave an opinion that indicated that he believed that [the defendant] had committed the alleged shooting crime" for which she was being tried. The defendant claims that the trial court violated Connecticut law in allowing the state to ask Fuller to express an opinion on the question of the defendant's guilt or innocence. The state, in arguing the rejection of this claim, maintains that her father's testimony was admitted on redirect examination for the purpose of rehabilitating Fuller after he was impeached. We are not persuaded by the defendant's claim.

The state argues that Fuller's answer to the question was not an opinion of guilt, but rather one of a suspicion that was expressly based on previously admitted evidence and that, in its ruling on its admission, the trial court properly exercised its wide discretion. We agree with the state.

Certain additional facts should be set out to afford a full understanding of this issue. The state called Fuller, who testified about the length and nature of the defendant's hostility toward the Leubas, including her anger and conduct on the night before the shooting when she came to his house with Rocco and Leonardi. Fuller, who lived alone, was still grieving over the death of his wife. He found it "very difficult" to testify because he did not want the defendant "to be in any kind of trouble at all." A portion of the statement he gave to the Groton police on the morning of June 29, 1995, after the shooting, was admitted into evidence under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The portion admitted under *Whelan* stated: "During the past year, [the defendant] made many threats toward the Leubas. For instance, wishing them dead. As far as I know, she has never attempted to carry out any of these threats. [The defendant] left the house with [Rocco] and [Leonardi] between 6:15 p.m. and 6:30 p.m."

On cross-examination and later recross-examination, the defendant tried to impeach Fuller's testimony by bringing out certain circumstances about his health, his medication and his conduct. This included that Fuller was suffering from depression in June, 1995, for which he took anti-depressants and that he also suffered from insomnia. Although he did not usually drink a large amount of hard liquor, he did so to help him sleep on the night of June 28, 1995, after the defendant left his house. On cross-examination, Fuller testified that he probably told his son that the defendant had urged Rocco and Leonardi "to go to the Leubas' home and try to shake them up and get them to leave her alone" on the evening of June 28, 1995. He testified on recross-examination that he was upset at the time that he gave his written statement, saying that "it was probably one of the worst days of my life." On redirect examination, the state asked Fuller about what he described as "one of the worst days of [his] life." Fuller stated that he first learned about the shooting when he awoke on the morning of June 29, 1995, and police cars were at his home. It was then that the state asked him the question and he gave the answer, over objection, that is in issue.

"No witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference.' " *State* v. *Black*, 109 Wash. 2d 336, 348, 745 P.2d 12 (1987); see *State* v. *Heinz*, 193 Conn. 612, 627, 480 A.2d 452 (1984); *State* v. *Donahue*, 141 Conn. 656, 667, 109 A.2d 364 (1954), appeal dismissed and cert. denied, 349 U.S. 926, 75 S. Ct. 775, 99 L. Ed. 1257 (1955); *State* v. *Oppedal*, 232 N.W.2d 517, 524 (Iowa 1975); *Seattle* v. *Heatley*, 70 Wash. App. 573, 577, 854 P.2d 658 (1993), review denied, 123 Wash. 2d 1011, 869 P.2d 1085 (1994). "In general, [t]estimony is objectionable if it embraces an opinion on the ultimate issue to be decided by the trier of fact." (Internal quotation marks omitted.) *State* v. *Spigarolo*, 210 Conn. 359, 372,

556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). "Whether a statement of a witness is one of fact or of conclusion or opinion within the rule excluding opinion evidence is to be determined by the substance of the statement rather than its form. The use of phraseology appropriate to the expression of an inference, such as 'believe,' 'think,' etc., may in fact signify an opinion which renders the statement inadmissible; but the use of such terms is not conclusive that the witness is stating his opinion, for the language may be used merely to indicate that he is not speaking with entire certainty, in which case the evidence may be received for what it is worth." 32 C.J.S. 303, Evidence § 510 (1996).

Black's Law Dictionary defines "opinion evidence or testimony" to mean "[e]vidence of what the witness thinks, believes, or infers in regard to facts in dispute, as distinguished from his personal knowledge of the facts themselves . . . ." Black's Law Dictionary (6th Ed. 1990). "As a matter of language, the word 'knowing' literally imports something pretty close to 100 [percent] certainty; 'believing,' something less than certainty; and 'suspecting,' something less certain than 'believing.' "[28] 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 8.10, p. 427. Black's defines "suspicion" to mean "[t]he apprehension of something without proof or upon slight evidence. Suspicion implies a belief or opinion based upon facts or circumstances which do not amount to proof." Black's Law Dictionary (6th Ed. 1990). Webster's states that "suspicion" means "imagination or apprehension of something wrong or hurtful without proof or on slight evidence." Webster's Third New Inter-

---

[28] One court has noted that "[a]n inference is to be distinguished from mere *suspicion* which is defined as 'the act or an instance of suspecting: imagination or apprehension of something wrong or hurtful without or on slight evidence . . . .' Webster's, New International Dictionary (3rd ed. 1961)." (Emphasis in original.) *State* v. *Barick*, 143 Mont. 273, 283, 389 P.2d 170 (1964).

national Dictionary (1986). "Suspicion" then does not rise to the level of "belief," let alone "knowledge." In context, the word that resonates in Fuller's answer and characterizes that answer is the word "suspicion." That marks the level of his perception of the circumstances and significantly, his "suspicion" was based on matters clearly before the jury in evidence that it could, as the trier of fact, accept or reject in whole or in part. It seems fair to say that when a person only *suspects* that a fact exists, here, that the defendant was the shooter, that person is doing nothing more than recognizing a "possibility" of the existence of that fact, but he has not concluded that it actually exists. It therefore cannot be said to be an opinion on the ultimate issue before the jury, i.e., guilt or innocence.

In further support of that position, it cannot be overlooked that this answer came in on a second redirect examination while the state was endeavoring to rehabilitate Fuller after the defense had sought vigorously to impeach not only his prior testimony, but also his written statements. The defense had opened the door in light of its cross-examinations. The state used redirect examination of Fuller for its basic purpose to enable him "to explain and clarify relevant matters in his testimony which [may] have been weakened or obscured by his cross-examination." *State* v. *Graham*, 186 Conn. 437, 448, 441 A.2d 857 (1982). Moreover, " '[g]enerally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. *State* v. *Roy*, 173 Conn. 35, 50, 376 A.2d 391 (1977); [C.] McCormick, Evidence (3d Ed. 1984) §§ 32, 57 [pp. 69–71, 146–49]. The party who initiates discussion on the issue is said to have "opened the door" to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party

initiating inquiry has made unfair use of the evidence.' *State* v. *Graham*, 200 Conn. 9, 13, 509 A.2d 493 (1986)." *State* v. *Williams*, 220 Conn. 385, 393, 599 A.2d 1053 (1991). The trial court did not abuse its discretion in its ruling on this issue.

## V

Next, the defendant claims that the trial court improperly admitted "Judge McMahon's nonexpert opinion of [her] psychiatric condition" inasmuch as he was not a psychiatric expert. This claim arises out of the circumstances occurring during a criminal pretrial conducted by the the court, *McMahon, J.*, on the morning of June 28, 1995, at the geographical area number ten courthouse in New London on an unrelated charge. The state claims that Judge McMahon's evidence was not admitted as expert opinion evidence that she needed psychiatric treatment, but as circumstantial evidence of her motive for attempting to shoot the Leubas the following morning.

Certain additional facts must be set out to put our discussion and analysis of this issue in proper focus. On the morning of June 28, 1995, the defendant went to court, unrepresented by counsel, for a criminal pretrial on an unrelated charge. Present at this pretrial in chambers were the defendant, Judge McMahon, an assistant state's attorney and a deputy sheriff. Consistently at the pretrial, Judge McMahon encountered difficulty in focusing on the matter at hand because the defendant "wanted to talk about being persecuted all her life" or, as Judge McMahon remembered the phrase, for the last twenty years. She told him of a recent incident in which she said that her car tires had been slashed and that she had gone to the police, apparently with no action resulting.[29] Judge McMahon advised her

[29] The defendant had also apparently gone to the police on earlier occasions, but without resulting action, from her point of view. She was frustrated and agitated about her inability to get help from the police.

to go to the police and then to the state's attorney's office. She responded, "I'm going to handle this my own way."

At the pretrial, the subject of an apparent anonymous letter that was in the state's file came up, and the defendant wanted to see it.[30] The judge instructed the assistant state's attorney to give her a copy of it and this was done. The judge had previously read this letter. The defendant objected to the context and veracity of the letter. She took exception to the letter characterizing her as being "insane" and stating that she had certain criminal involvement. Her attitude and demeanor fluctuated during the pretrial. Judge McMahon testified that "by and large [by] the latter part of the pretrial she was agitated and was clearly trying to maintain self-control."

After a full discussion about a possible disposition, Judge McMahon indicated that she would receive "a suspended sentence if she agreed to go to psychiatric treatment." He testified that his decision to go along with the condition of psychiatric treatment was based, in part, on his observations of her attitude and demeanor during the pretrial. Upon learning of her options, the defendant asked the judge if he would continue the matter for one week and he agreed. The defendant was upset after the pretrial conference with Judge McMahon; she was not "keen" about any of the choices given to her as the result of that conference.

Initially, we note that calling a judge as a witness is not encouraged unless there is a compelling need for his testimony, but a judge is not automatically disqualified by virtue of his office and is competent to testify concerning facts that he observed at a prior or collateral proceeding. *Gold* v. *Warden*, 222 Conn. 312, 320, 610 A.2d 1153 (1992). It also should be pointed out that

---

[30] This letter, according to Judge McMahon, was one that "had to do with her feelings that someone was out to get her."

" '[s]entencing is an individualized procedure in which the court has the grave responsibility to determine and impose, within applicable statutory limits, the appropriate punishment for a particular defendant. *Williams* v. *New York*, 337 U.S. 241, 246–49, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949).' *State* v. *Candito*, [4 Conn. App. 154, 158, 493 A.2d 250 (1985)]." *State* v. *Garvin*, 43 Conn. App. 142, 151, 682 A.2d 562 (1996), aff'd, 242 Conn. 296, 699 A.2d 921 (1997). Our Supreme Court has stated that "[a] sentencing judge has very broad discretion in imposing any sentence within the statutory limits and in exercising that discretion he may and should consider matters that would not be admissible at trial." (Internal quotation marks omitted.) *State* v. *Huey*, 199 Conn. 121, 126, 505 A.2d 1242 (1986); see *State* v. *Colette*, 199 Conn. 308, 320, 507 A.2d 99 (1986). There can be no real question but that Judge McMahon could appropriately order psychiatric treatment as a condition of probation on the suspended sentence option he discussed with the defendant. In doing so, he was hardly deciding, as an expert, that she *actually had* a psychiatric problem.[31]

We agree that Judge McMahon's testimony concerning the psychiatric option of the proposed sentencing discussion was not admitted for the purpose of showing that the defendant *needed* such treatment but rather as circumstantial evidence of her motive for attempting to shoot the Leubas on the following morning. "Courts have described the concept of motive as 'the reason that nudges the will and prods the mind to indulge the criminal intent.' [*United States*] v. *Beechum*, 582 F.2d 898, [911–12 n.15] (5th Cir. 1978), cert. denied, 440 U.S. 920, 99 S. Ct. 1244, 59 L. Ed. 2d 472 (1979), and as an inducement or state of feeling that impels and tempts the mind to indulge in a criminal act. 2 Wigmore, Evi-

---

[31] Actually, the record on this issue indicates that on occasion this condition of probation was referred to as a psychiatric "evaluation" as opposed to "treatment."

dence [(3d Ed.) §§ 396, 397]; [*United States*] v. *Beechum*, supra [911–12 n.15]. The motive is a cause which comes into play before the criminal act and of which the act is the effect." *United States* v. *Gonzalez*, 610 F. Sup. 568, 576 (D.P.R. 1985). "Motive is not an element of the crime charged, and the state is under no obligation to show a motive of the accused to commit the crime charged. *State* v. *Rathbun*, 74 Conn. 524, 529, 51 A. 540 [1902]." *State* v. *Annunziato*, 169 Conn. 517, 530, 363 A.2d 1011 (1975). "Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant. . . . This factor is to be weighed by the jury along with the other evidence in the case." (Citation omitted.) *State* v. *Gunning*, 183 Conn. 299, 311–12, 439 A.2d 339 (1981). "An inquiry as to motive is often of great importance, particularly in a case resting upon circumstantial evidence." 1 F. Wharton, Criminal Evidence (14th Ed. Torcia 1985) § 109, p. 386.

During direct examination, Judge McMahon was asked whether making a psychiatric evaluation a condition of the recommendation of a suspended sentence with probation was based on his observations of the defendant and her demeanor during the pretrial conference. The defendant objected stating that the state was "essentially" asking the witness to give an opinion that she was "psychologically unstable" and "warranted psychiatric treatment." The court said that it did not "read [the state's] question that way," but rather that the state was asking the witness, on the basis of his "observations of how she was conducting herself or her conduct and comments during the pretrial, whether it was . . . the predicate for his, Judge McMahon's, suggesting as a condition of any disposition that she have [a] psychiatric evaluation." The state claimed that "the reason for the question is the evidence, is that, at the least the

state claims the evidence that's been set forth so far, and will be set forth in the future, is that one of the things that triggered her emotional outrage at that time was being told that a part of this disposition was that she had to get psychiatric counseling." Judge McMahon, upon being permitted to answer the question, said that was part of the reason he agreed with the condition of such counseling. It is clear that the state's claim went to motive and was not in the nature of expert opinion.

Moreover, during final arguments, both the state and the defendant treated Judge McMahon's evidence as going to motive. In its opening argument, the state stressed the defendant's anger and agitation about the counseling option, her talk of continuing to be persecuted at that time, her frustration with the inaction of the police as to her complaints and her intention to take care of the matter herself. The state also argued that "everything came to a head" at that pretrial conference. The defense argued that it was simply wrong for the state to argue that "the precipitory event" of the shooting was the defendant's "take care of it herself" remark to Judge McMahon at that conference because there were other plausible interpretations of that part of her conduct. The point made is that portion of Judge McMahon's testimony went to motive and both parties treated it in that manner. In short, the trial court's ruling was appropriate.

## VI

Finally, the defendant claims that Judge Parker, the trial judge, was "improperly influenced" by his professional relationship with Robert C. Leuba. The defendant has a number of arguments concerning this claim, including her claim that Robert C. Leuba was at all relevant times the deputy chief court administrator of this state's trial courts and, in that capacity, exercised authority over Connecticut Superior Court trial judges,

including Judge Parker. Because of that professional relationship, the defendant claims, Judge Parker should have disqualified himself but refused to do so. The defendant suggests, without any analysis, that her request for disqualification was grounded "upon constitutional guarantees of due process[32] and upon General Statutes § 51-39a,[33] which required disqualification when a judge's impartiality might reasonably be questioned." Further, the defendant argues that the question of Judge Parker's "actual [partiality]" became evident when certain of his "subsequent [to the filing of her formal motion to disqualify] on the record statements and acts" are viewed together. Continuing, she maintains that "[a]lmost all of Judge Parker's evidentiary rulings were materially prejudicial to [her] and constituted grounds for a mistrial."[34] In addition, the defen-

---

[32] The defendant's argument lacks merit. In any event, it is rendered academic by our analysis of the disqualification issue of both the pretrial motion to disqualify and the posttrial claim as to disqualification. In addition, this claim is not entitled to review as it lacks analysis and, therefore, is inadequately briefed. See *Middletown Commercial Associates Ltd. Partnership* v. *Middletown*, 42 Conn. App. 426, 439 n.12, 680 A.2d 1350, cert. denied, 239 Conn. 939, 684 A.2d 711 (1996), on appeal after remand, 53 Conn. App. 432, 730 A.2d 1201, cert. denied, 250 Conn. 919, 738 A.2d 657 (1999).

[33] This argument also lacks merit. See General Statutes § 51-39a. In any event, we consider this issue abandoned. "Assignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Fitzgerald* v. *Fitzgerald*, 16 Conn. App. 548, 554, 547 A.2d 1387, cert. denied, 210 Conn. 802, 553 A.2d 615 (1988).

[34] This claim is not entitled to review because it lacks analysis and is, therefore, inadequately briefed. See *Middletown Commercial Associates Ltd. Partnership* v. *Middletown*, 42 Conn. App. 426, 439 n.12, 680 A.2d 1350, cert. denied, 239 Conn. 939, 684 A.2d 711 (1996), on appeal after remand, 53 Conn. App. 432, 730 A.2d 1201, cert. denied, 250 Conn. 919, 738 A.2d 657 (1999). Moreover, "[a]dverse rulings do not themselves constitute evidence of bias. *Hartford Federal Savings & Loan Assn.* v. *Tucker*, 192 Conn. 1, 8, 469 A.2d 778 (1984)." *State* v. *Fullwood*, 194 Conn. 573, 582, 484 A.2d 435 (1984). Our Supreme Court has stated: "The fact that a trial court rules adversely to a litigant, even if some of these rulings were to be determined on appeal to have been erroneous, does not demonstrate personal bias." *Bieluch* v. *Bieluch*, 199 Conn. 550, 553, 509 A.2d 8 (1986).

dant argues that the trial judge "scorned" case law decisions and rules of evidence in finding the evidence sufficient on the fifth count[35] (carrying a pistol without a permit) and in admitting the "opinion"[36] of the defendant's father on her guilt or innocence, as well as denying her counsel's request to charge the jury on lesser included offenses.[37]

The defendant also maintains that Judge Parker's "extraordinary announcement," prior to imposing sentence, that the defendant had "benefited"[38] from the jury's verdict was prejudicial. She claims that "it was apparent from his statement that, had he been the trier of fact, he would also have convicted her on the attempt to commit murder counts." She further claims that his statement was a violation of Canon 3 (B) (9) of the Model Code of Judicial Conduct of the American Bar Association. Further, she maintains that the sentence imposed was "draconian"[39] in nature and was imposed in the context of improper remarks by the trial judge. She claims, in an obvious, though not explicit, reference to Robert C. Leuba, that the acts of the trial judge of which she complains "when viewed as a whole . . . [were] designed to gratify just one member of the pub-

---

[35] This claim has been disposed of in part II of this opinion.

[36] This claim has been disposed of in part IV of this opinion.

[37] This claim has been disposed of in part I of this opinion.

[38] This argument has no merit. The challenged remark, viewed in context, was stated when the trial court, in its opening remarks on sentencing, said: "There's not much the court can say. The court has the verdict of the jury. It agrees with the jury's verdict. In fact, I think the defendant *benefited* by the jury's verdict. I would have read the case differently. I read the case differently. I would have expected the jury to have found her guilty on the first two counts [attempted murder] also." (Emphasis added.)

We do not agree with the manner in which the defendant views this remark. When taken in context, the court was merely saying that it believed that the jury would return a verdict of guilty on the first and second counts and not on the third and fourth counts. This is not improper.

[39] The claimed severity of the defendant's sentence is a matter properly presented to the sentence review division of the Superior Court. See General Statutes § 51-194 et seq.

lic, an individual with the power to exert significant influence over Judge Parker's life and livelihood—by ensuring that this innocent defendant, who never should have been arrested for this fictional crime, would be held behind bars for the remainder of [Robert C. Leuba's] life."[40] We do not agree with any of the claims.

Prior to the trial, the defendant filed her "Motion for Disqualification of Judicial Authority,"[41] which sought to disqualify Judge Parker. It alleged in part that Judge Parker "is subject to the managerial discretion within the scope of the deputy chief court administrator [Robert C. Leuba], creating not just the potential for an appearance of impropriety or an interest that could be substantially affected by the outcome of the proceedings but, most importantly, whether the court can in fact be completely impartial." Judge Parker wrote a comprehensive decision on that motion, which he denied. In that decision, he noted the following colloquy between the court and defense counsel.

"The Court: It is your claim that there's a basis for a finding of . . . a lack of impartiality on my part that is different than that which would be applicable to all the other judges?

"[Defense Counsel]: Absolutely not, Your Honor, and if Your Honor is inferring that from my motion—and I'd submit it's badly written. Your Honor was merely the judge who was sitting on the case after, I believe,

---

[10] Just before sentence was imposed, the defendant, in exercising her right of allocution, made the following statement: "I have done nothing wrong. I am the victim of a terrible criminal conspiracy. The Leubas, the police and the others framed me with having wrongfully convicted me of a crime that I did not commit through perjury, false evidence and other deceptions, and I despise them all for it."

[41] This motion and Judge Parker's decision on the motion for disqualification are printed in full in the record of this case and will not be set out here.

Judge Purtill recused himself and so you are the instant court."

In Judge Parker's decision, he noted the importance[42] of this concession by defense counsel that the grounds for disqualification asserted against him would apply equally to all other Superior Court judges. Judge Parker then appropriately pointed that our Supreme Court "faced a like situation" in *Dacey* v. *Connecticut Bar Assn.*, 170 Conn. 520, 368 A.2d 125 (1976), and referred to the United States Supreme Court and other federal precedent, which in effect stands for the "maxim of law to the effect that where all [judges] are disqualified, none are disqualified." (Internal quotation marks omitted.) *Pilla* v. *American Bar Assn.*, 542 F.2d 56, 59 (8th Cir. 1976); see *Evans* v. *Gore*, 253 U.S. 245, 247–48, 40 S. Ct. 550, 64 L. Ed. 887 (1920). We agree with the reasoning and result reached by Judge Parker on the defendant's pretrial motion to disqualify him.

Insofar as the defendant claims that there was not only an issue of the appearance of impropriety, but also one of actual partiality on the part of the trial judge, the record clearly does not give any support to such a claim. Specifically, the defendant claims that because of what she calls the "institutional relationship" and "professional relationship" between the trial judge and Robert C. Leuba as deputy chief court administrator, such partiality existed on the part of the trial judge. We disagree, and the short answer to any such claim is that there is no evidence before this court to that effect. In

---

[42] At that point, Judge Parker wrote the following: "[The] defendant concedes that the grounds for disqualification asserted against this one judge would apply equally to all other judges of the Superior Court. This concession is important. If this judge were disqualified, and therefore recused himself, a like motion could be directed to each and every judge of the Superior Court assigned to this case. Such a motion or motions should have the same result, disqualification and recusal of each judge assigned. Then, there would be no judge to preside over the trial of [the] defendant's case, probably resulting in the eventual dismissal of the charges against her."

reaching this conclusion, we recognize not only that the chief court administrator has extensive authority over the judicial branch and all of the Superior Court judges; see, e.g., General Statutes §§ 51-5a, 51-9, 51-11, 51-45a, 51-45b, 51-164t and 51-183a; but that he also appoints the deputy chief court administrator and together, they decide the assignments of each Superior Court judge. In addition, we find that there is no evidence in this record to indicate that Robert C. Leuba, directly or indirectly, exercised any of his authority to affect the objectivity of the trial judge throughout this case.

The judgment is affirmed.

In this opinion the other judges concurred.