LORNA J. WENDT *v.* GARY C. WENDT
(AC 18388)

Lavery, C. J., and Spear and Mihalakos, Js.

Argued April 4—officially released September 5, 2000

*Kathleen A. Hogan,* with whom, on the brief, were *Arnold H. Rutkin* and *Sarah S. Oldham,* for the appellant (plaintiff).

*Kurt W. Hansson,* with whom were *Louis K. Fisher* and, on the brief, *John S. McGeeney* and *James R. Bliss,* for the appellee (defendant).

*Opinion*

LAVERY, C. J. The plaintiff in this action for the dissolution of a marriage appeals from the judgment of the trial court. The plaintiff claims that the court improperly (1) utilized dates prior to the date of the dissolution of the marriage in making various calculations and divisions regarding contingent and deferred assets of the marriage, (2) divided the defendant's supplementary pension plan, (3) excluded from division the passive appreciation of various assets that occurred while the action was proceeding, (4) concluded that General Statutes § 46b-81 was interpreted consistently with article first, § 20, of the constitution of Connecticut, (5) considered sources outside the record in reaching its decision, (6) excluded evidence and testimony regarding the values of termination and severance packages, and (7) demonstrated gender bias in favor of the defendant. We affirm the judgment of the trial court.

The following facts are relevant to the resolution of this appeal.[1] As of the date of the articulated memorandum of decision, the defendant, Gary C. Wendt, was the chairman, president and chief executive officer of GE Capital Services, Inc. (GECS), with principal offices in Stamford. GECS is the largest division of General Electric Corporation (GE), which is believed to be one

---

[1] The court authored a comprehensive and thorough memorandum of decision articulating the complete background of the parties. The court's 500-plus page decision no doubt is one of the longest and most exhaustive analyses of a marital dispute in our state's history. Prior to issuing its completed memorandum of decision on March 31, 1998, the court on December 3, 1997, issued a partial memorandum of decision detailing its financial orders. See *Wendt* v. *Wendt,* Superior Court, judicial district of Stamford-Norwalk, Docket No. 149562 (December 7, 1997) (20 Conn. L. Rptr. 425) (partial opinion).

of the largest corporations in the world. The plaintiff, Lorna J. Wendt, has been throughout most of the parties' marriage a mother, homemaker and corporate wife who entertained GE customers and other business associates in various social and business settings. The plaintiff was neither employed nor paid by GE or GECS.

The plaintiff and the defendant were married in 1965. Thereafter, the plaintiff worked as a music teacher in Massachusetts while the defendant studied for his master's degree in business administration at Harvard University. The plaintiff stopped working as a music teacher after the first of the parties' two daughters was born in December, 1968.

After working in various positions, the defendant joined GECS in July, 1975, as the vice president of the real estate department. The defendant's employment with a major international corporation triggered an increased workload and extensive social duties. Entertainment grew more formal and on a larger scale, and the plaintiff commonly hosted events.

The defendant met with continuous success at GECS, successfully rescuing various financially troubled divisions within GECS, which gave him increased prominence within GE and culminated in his promotion to chief executive officer of GECS. The plaintiff's entertainment duties increased with the expansion of the defendant's corporate responsibilities. She traveled extensively with the defendant to numerous countries. During these years, she raised the children, cleaned house, paid bills, attended various functions and participated in their local church. Both parties acknowledged that the other party substantially contributed to instilling in their children high moral and family values.

As chief executive officer, the defendant proved to be highly effective and was well deserving of his high level of compensation. The defendant's career as chief

executive officer is marked with success after success. The defendant also participated in the parties' family life and in raising their two children. He drove the children to camp and college, helped with homework, attended school functions, cared for them when they were sick, and helped them plan for college and graduate school. The defendant was active in civic affairs and received awards for his accomplishments.

Eventually, the marriage eroded and the parties were separated on December 1, 1995. The plaintiff filed a dissolution complaint on December 19, 1995. During an eighteen day trial, virtually every aspect of the parties' financial relationship over the thirty-two and one-half year marriage was examined. There were more than 100 exhibits, and numerous witnesses and multiple expert witnesses. Briefs of counsel, and citations to foreign cases and law review articles added an additional 1500 pages of material for the court to review. On December 3, 1997, the court entered orders regarding property distribution, alimony and related financial matters. A subsequent memorandum of decision more than 500 pages long containing comprehensive factual findings and legal analysis was issued on March 31, 1998. The plaintiff appealed on May 8, 1998. Additional facts will be discussed where necessary to the issues on appeal.

I

The plaintiff claims that the court improperly valued various contingent and deferred assets of the marriage. We disagree.

"Our standard of review is well settled. We review financial awards in dissolution actions under an abuse of discretion standard. . . . [T]o conclude that the trial court abused its discretion, we must find that the court either incorrectly applied the law or could not reasonably conclude as it did. . . . [T]he factual findings of a trial court on any issue are reversible only if they

are clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Wilkes* v. *Wilkes*, 55 Conn. App. 313, 317, 738 A.2d 758 (1999); *Schult* v. *Schult*, 40 Conn. App. 675, 682, 672 A.2d 959 (1996), aff'd, 241 Conn. 767, 699 A.2d 134 (1997).

## A

The plaintiff claims that the court improperly valued and divided assets of the marriage as of the date of the parties' separation, December 1, 1995,[2] instead of the date of dissolution, December 3, 1997, as it is required to do. We disagree.

"In a dissolution action, marital property is valued as of the date of dissolution, not the date of separation. *Tobey* v. *Tobey*, 165 Conn. 742, 748–49, 345 A.2d 21 (1974); *Cuneo* v. *Cuneo*, 12 Conn. App. 702, 533 A.2d 1226 (1987). [This] requirement is simply part of the

[2] The plaintiff challenges this separation date found by the court as arbitrary and having no significance. We disagree. The court found that the plaintiff's "nonmonetary contributions to the marriage and her corporate wife contributions ended on December 1, 1995." In addition, the court stated: "(1) the children were grown and no longer living in the marital home; (2) the parties no longer lived together and have not been living together since December 1, 1995; (3) since December 1, 1995, the day of separation, the wife has not been included in any GE activities, including [during] all of 1996 and 1997; and (4) the wife is not supportive of the husband due to the contested dissolution matter pending in the Superior Court." These considerations make the December 1, 1995 separation date, as found by the court, far from meaningless.

broader principle that the financial awards in a marital dissolution case should be based on the parties' current financial circumstances to the extent reasonably possible." (Internal quotation marks omitted.) *Zern* v. *Zern*, 15 Conn. App. 292, 296, 544 A.2d 244 (1988); see also General Statutes § 46b-81.

The plaintiff's claim fails because the court did exactly what § 46b-81 and interpreting cases require: The court valued the marital property at the date of dissolution. As the court stated in its memorandum of decision: "This court has attempted to value the assets as of the date of the decree, December 3, 1997. By dividing a majority of the assets in kind, the court believes it has accomplished that result. The contingent resources were divided by a coverture factor using the date of separation due to the lack of plaintiff's 'contributions' after the parties' separation. The use of this coverture factor divides the assets as of the date of separation. *These assets were valued as of the date of the decree and merely divided as of the date of separation.*" (Emphasis added.)

Our careful examination of the court's findings of fact reveals that the court's decision was not improper. First and foremost, the court explicitly stated that it valued the assets as of the date of the dissolution decree. This statement even serves as a heading for one of the subsections of the court's memorandum of decision. Indeed, with respect to GE stock, which constitutes the majority of the value of the assets in this case, the court expressly stated that it would divide the stock, along with cash and mutual funds, "as of their date of decree value."

A review of the court's reasoning reveals a careful and thoughtful discussion of the proper distribution of the assets and that valuation occurred at the date of

the decree.[3] It is black letter law that Connecticut is an equitable distribution property state; *Krafick* v. *Krafick*, 234 Conn. 783, 792, 663 A.2d 365 (1995); and that this approach to property division "does not limit, either by timing or method of acquisition or by source of funds, the property subject to a trial court's broad allocative power." Id.; *Tyc* v. *Tyc*, 40 Conn. App. 562, 565–66, 672 A.2d 526, cert. denied, 237 Conn. 916, 676 A.2d 398 (1996); annot., Divorce: Equitable Distribution Doctrine, 41 A.L.R.4th 481 (1985).[4]

The plaintiff makes much of the fact that the court looked to the date of separation when considering the ultimate distribution of the assets. This consideration by the court was not improper. The principle that requires the court to value assets as of the date of dissolution does not absolutely preclude the court from

[3] The plaintiff contends that the court improperly relied on *Sunbury* v. *Sunbury*, 216 Conn. 673, 583 A.2d 636 (1990), for the conclusion that applying a valuation date earlier than the date of dissolution was appropriate. *Sunbury* states that absent "exceptional intervening circumstances," the date of dissolution is the appropriate date for valuing marital assets. Id., 676. The plaintiff argues that the court improperly applied the exceptional intervening circumstance language, as an increase in the value of the property postdissolution does not constitute an exceptional intervening circumstance. Id. We need not consider this contention, as the court's reliance on *Sunbury* on this ground was a mere "alternative finding," in the court's phrasing, to the division of assets described in the body of this opinion.

[4] The court used an "intrinsic value" method for determining the value of the relevant assets as of the date of dissolution. This method arrived at a higher valuation of the defendant's unvested stock options than did the valuation method known as the Black-Scholes method, which the plaintiff's expert advocated. See F. Black & M. Scholes, "The Pricing of Options and Corporate Liabilities," 81 J. Pol. Econ. 637 (1973). The Black-Scholes method of valuation "is a complex formula which reflects the interrelationship of the fair market value of the stock to be purchased, the exercise price of the option, the amount of dividends to be paid on the stock over the life of the option, the 'risk-free' rate of return at the time the option is granted, the volatility of the stock to be purchased, and the term of the option." *Snyder* v. *Commissioner*, 93 T.C. 529, 540 (1989). Not surprisingly, the plaintiff does not challenge the court's choice of valuation methods. Accordingly, we do not discuss it further.

considering the significance of the date of separation. "Although § 46b-81 indicates that it is the date of dissolution, rather than the date of separation, on which the parties, marital assets are to be determined . . . the date of separation may be of significance in determining what is equitable at the time of distribution. In distributing property pursuant to § 46b-81, the court is instructed to consider the contribution of each spouse in the acquisition, preservation and appreciation of the marital estate. After the date of separation, it is not difficult to conceive that one spouse may acquire a particular asset without any contribution from the other spouse." (Citation omitted.) *Bornemann* v. *Bornemann*, 245 Conn. 508, 536–37, 752 A.2d 978 (1998).

The *Bornemann* decision proves instructive.[5] In this case, the court acted well within its discretion to consider the contributions of the parties to the acquisition, preservation and appreciation of the assets postseparation. The court found that the defendant, as the chief executive officer of GECS, was partially responsible for the extraordinary performance of GE stock when compared to the stock market as a whole. The court further found that the plaintiff's nonmonetary contributions to the marriage and "corporate wife" contributions ended on December 1, 1995. Accordingly, the court concluded that "[t]he doubling of GE stock since the date of separation is not due to the plaintiff's efforts."

Once the court made findings regarding the postseparation contributions of the parties to the maintenance and growth of the assets, it then assigned values for each party's contribution in accordance with those findings. Although the plaintiff did not make corporate wife

---

[5] Since the *Bornemann* decision was issued before the plaintiff filed in this court her principal brief and reply brief, we fail to understand why she failed to discuss this pivotal case in any meaningful manner in those briefs.

contributions after December 1, 1995, the court concluded, regarding GE stock, that "she should share in the general increase in the investment community." The court awarded the plaintiff passive stock appreciation and also gave offsetting cash awards—$1,017,000 and $1.7 million for unvested and vested stock options, respectively. The defendant, in turn, received all right, title and interest in these vested and unvested stock options free and clear of all claims by the plaintiff.

The court properly valued the assets at the date of dissolution and allocated them after taking into consideration postseparation contributions. The court acted well within its extensive discretion regarding financial awards in dissolution actions, and we see no reason to disturb these findings.

B

The plaintiff argues that the court abused its discretion in selecting various dates to calculate a "coverture factor" for dividing various unvested assets arising from the defendant's employment at GE.

The court established various "coverture factors" for determining the portion of an asset's value that is marital property, a calculation that is necessary when the asset was given in exchange for work done both during and after the marriage. The coverture factor that the court used to divide the defendant's unvested stock options will serve as a vehicle for the discussion of the plaintiff's claim that the coverture factors the court used were incorrect.

The coverture factor established by the court for the unvested stock options consisted of a fraction, "the denominator of which shall be the number of months from the date of grant to the date of vesting [when the options no longer will be] subject to divestment, and the numerator [of which shall] be the number of months

from the date of grant to December 1, 1995 [the date of the parties' separation]." Specifically, the plaintiff challenges the coverture numerator, contending that the court should have used the date that the defendant's employment commenced instead of the date that the unvested assets were granted and the date of dissolution instead of the date of separation. We disagree.

At the outset, we note that the term "coverture factor" never has been used by our appellate courts, although in *Bornemann* v. *Bornemann*, supra, 245 Conn. 524, our Supreme Court described a similar tool, which it called a "time rule." Because "coverture factor" is a new term in our judicial lexicon, we briefly examine its origin. Coverture is defined as "[t]he status and rights of the wife arising from the marriage relationship"; Ballentine's Law Dictionary (3d Ed. 1969); and has a long history of use regarding marital assets. See *Torlonia* v. *Torlonia*, 108 Conn. 292, 296, 142 A. 843 (1928). Traditional common-law applications of coverture defined the state of a married woman whereby her civil existence merged with that of her husband for many purposes. *Brawner* v. *Brawner*, 327 S.W.2d 808, 811 (Mo. 1959) (en banc), cert. denied, 361 U.S. 964, 80 S. Ct. 595, 4 L. Ed. 2d 546 (1960). Coverture implied that the woman was under the protection of her husband and that the common law would not allow her to do anything that might prejudice her rights or interests without his advice, consent and approval. Id. These common-law disabilities of coverture have long since been abolished. See 41 C.J.S. 404–405, Husband and Wife § 107 (1991). In modern times, a coverture factor has reemerged as a mechanism for apportioning between spouses the benefit or value of unvested stock options, retirement plans or other benefits that were earned partially during and partially after the marriage. See *In re Marriage of Short*, 125 Wash. 2d 865, 872, 890 P.2d 12 (1995) (en banc) (discussing "time rule" formula). A coverture fac-

tor is a flexible concept, and "we stress that no single rule or formula is applicable to every dissolution case involving employee stock options. Trial courts should be vested with broad discretion to fashion approaches which will achieve the most equitable results under the facts of each case." *In re Marriage of Hug*, 154 Cal. App. 3d 780, 792, 201 Cal. Rptr. 676 (1984). The concept of a coverture factor has been adopted in a number of our trial court decisions to divide marital property. E.g., *Masi* v. *Masi*, Superior Court, judicial district of Waterbury, Docket No. 118171 (April 17, 1996); *Mainville* v. *Mainville*, Superior Court, judicial district of New Haven at Meriden, Docket No. 251375 (December 4, 1996).

*Bornemann*'s dictates on the apportionment of unvested stock options prove telling. After examining the approaches of various jurisdictions, the court stated: "We are persuaded that the majority approach that apportions unvested stock options between marital and nonmarital property according to when the options were earned provides the most appropriate method of classification under § 46b-81. The majority approach is analogous to the approach adopted in [*Sunbury* v. *Sunbury*, 216 Conn. 673, 583 A.2d 636 (1990)] wherein this court considered how and when the asset at issue was earned in classifying it as nonmarital property. [Id.,] 676–77. In addition, by allowing for apportionment of the options between marital and nonmarital property based upon the contributions of each spouse toward their acquisition, the majority approach advances the equitable purpose underlying § 46b-81 of recognizing the contributions of both spouses in a joint enterprise." *Bornemann* v. *Bornemann*, supra, 245 Conn. 525. Commentators have agreed with this conclusion. "Depending upon the nature of the property in question, however, the court may properly consider whether the contributions or other efforts took place before or after

the parties separated or commenced the dissolution action." A. Rutkin, E. Effron & K. Hogan, 7 Connecticut Practice Series: Family Law and Practice with Forms (1991) § 26.13, p. 395 & nn.13–14, citing *Dubicki* v. *Dubicki*, 186 Conn. 709, 443 A.2d 1268 (1982); *Papageorge* v. *Papageorge*, 12 Conn. App. 596, 533 A.2d 229 (1987).

The plaintiff states that a coverture factor has no application where benefits are granted entirely in recognition for past or present services. As previously discussed, *Bornemann* instructs that this statement likely is true. When applied to the facts of this case, however, it has no relevance.

The court found that the "420,000 shares of [the] GE Unvested Stock Option plan . . . were granted partially for present, but largely for future services and, therefore, a coverture factor should be used to distribute the resource." The court also stated: "After examination of all the witnesses' testimony and [certain exhibits], this court concludes that the two contingent resources (restricted stock and unvested stock options) were granted partially for future employment. None can be categorized solely as 'golden handcuffs.' Both, though, refer to an 'incentive to remain with GE indefinitely in the future' or similar language. All refer to the defendant as a long and valued employee who has performed at an extremely high level. The GE Stock Option program 'is a vital element of the company's drive to empower and motivate outstanding, long-term contributions by the high performing executives who will lead GE into the 21st century.' . . . '[The stock options and restricted stock units] provide strong incentive for continued superior performance because unexercised [stock options and restricted stock units] for which the restrictions have not lapsed are forfeited if the executive officer is terminated by the company for performance or voluntarily leaves the company before retirement.' . . .

"Both of the two contingent resources (unvested stock options and restricted stock) contain provisions for future performance and future compensation. The restricted stock pays current 'dividend equivalents' and thus is remuneration in part for present service. The unvested stock options also contain elements of compensation for past and present services. Thus, these two contingent resources are subject to distribution by use of the coverture factor."[6]

Although the plaintiff may dispute these factual conclusions, the determination of why unvested stock options were granted is a factual finding that falls within the province of the trial court and its broad discretion. See *Bornemann* v. *Bornemann*, supra, 245 Conn. 526–27. We conclude that the court articulated findings on the basis of ample evidence to support the conclusion that at least a partial reason for the issuance of the contingent assets was for the future, and not the present or past, performance of the defendant. The plaintiff argues that the numerator of the coverture factor should be the number of months from the date of employment until the date of dissolution, rather than the number of months from the date the option was granted until the date of separation. The court's selection of the date of grant as the start date for determining the numerator

---

[6] The court's discussion of stock options and their purpose is a useful one: "Stock options for future compensation can include: specific language to that effect in the grant documents, long-term retention of key executives, increasing the executive's incentives and efforts, providing security for the executive and 'golden handcuffs.' This type of option for future compensation is granted to ensure the employee's continued employment and future productivity. The valued employee is offered an incentive to remain with the company because if he is no longer with the company, the 'golden handcuff' option terminates with no payment to the employee. These incentive stock options, awarded now, but for labor to be expended in the future, beyond the date of dissolution, are not divisible. Evidence of the future nature of the option is usually found in the language of the option grant or employment agreement." See *Bornemann* v. *Bornemann*, supra, 245 Conn. 518; *In re Marriage of Short*, supra, 125 Wash. 2d 873.

of the coverture factor appropriately accounts for the fact that the primary purpose of the unvested stock options was to compensate the defendant for performance occurring after the date of the granting of the options. Accordingly, the selection of the options grant date as an appropriate marker for calculating coverture was within the court's discretion.

Similarly, the court properly selected the date of separation as a coverture factor because it found that the plaintiff had ceased contributing to the marital assets on that date. As we stated in footnote 2, after December 1, 1995, the plaintiff did not live with the defendant, raise their children, since they already were grown, or include herself in any GE activities. *Bornemann* instructs that permitting the apportionment of options on the basis of the contribution of each spouse toward their acquisition advances the equitable purpose of § 46b-81 of recognizing the contributions of both spouses in a joint enterprise. Id., 525. Accordingly, we conclude that the application of the date of separation as a coverture factor was within the court's discretion.

C

The plaintiff argues that the court improperly valued and divided certain deferred compensation plans as of December 31, 1996, which is one year prior to the dissolution date, because significant changes in value occurred subsequent to December 31, 1996, that were unaccounted for. We disagree.

Our Supreme Court has noted that "a trial court, in valuing the parties' assets upon dissolution, has considerable discretion in selecting and applying an appropriate valuation method. In assessing the value of . . . property . . . the trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value, and then employs

the most appropriate method of determining valuation. . . . The trial court has the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as he finds applicable; his determination is reviewable only if he misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was his duty to regard." (Internal quotation marks omitted.) *Krafick* v. *Krafick*, supra, 234 Conn. 799–800.

Although the plaintiff notes five asset categories in her principal brief, her challenge on this ground focuses on three deferred compensation plans that the court awarded in their entirety to the defendant—the General Electric Savings and Security Program (401 [k] plan), the General Electric Deferred Incentive Compensation Plan and the General Electric Deferred Salary Plan.[7] The court used financial statements dated December 31, 1996, which were prepared by the defendant's accountant.

The plaintiff fixates on a single order of the court that states: "The defendant shall pay to the plaintiff the sum of $2,000,000 as property distribution to be paid on January 6, 1998." This order immediately follows the orders granting the defendant the deferred compensation plans. Perhaps on the basis of proximity alone, the plaintiff arbitrarily categorizes this award as an offset for the three plans awarded to the defendant in their entirety.[8] She then uses this assumption to argue that the $2 million offset is improperly valued. She contends that since the awards to the defendant were based on December 31, 1996, financial data, her $2 million

---

[7] The other two plans mentioned by the plaintiff are the GE restricted stock and the General Electric Long Term Bonus Award plan. The court awarded the plaintiff a portion of these assets.

[8] Even the plaintiff in her principal brief shows that she is not certain that it is an offset, calling it an *"apparent* off-setting award of $2,000,000." (Emphasis added.)

"offset" from those awards must be increased to account for increases in interest or appreciation in value from the time of trial.

The plaintiff's argument holds no merit, as we cannot assume that the award is an offset, let alone an improper one. There is no evidence in the court's memorandum of decision to support the conclusion that the $2 million award to the plaintiff was an offset for the allocation to the defendant of the three previously mentioned deferred compensation plans. Merely because the $2 million order follows in sequence the deferred compensation awards does not make it an offset for those awards. Nowhere in the court's decision does it state that the purpose of this award was an offset for the deferred compensation plans awarded to the defendant.

Furthermore, the plaintiff failed to seek an articulation from the court. See Practice Book § 4051, now § 66-5. It was the plaintiff's burden, as the appellant, to file a motion for articulation that would clarify the basis of and reasoning for the court's decision on this ground. See Practice Book § 4051, now § 66-5; *State* v. *Lex Associates*, 248 Conn. 612, 633 n.3, 730 A.2d 38 (1999) (*Berdon, J.*, concurring in part, dissenting in part). Since the plaintiff did not seek an articulation, she cannot now claim, on the basis of her assumptions, that the court acted improperly. See *Puris* v. *Puris*, 30 Conn. App. 443, 450, 620 A.2d 829 (1993).

Even if, arguendo, we somehow credit the plaintiff's "offset" assumption, the award and its valuation was not an abuse of the court's broad discretion. The court took into account relevant considerations beyond the December 31, 1996, financial statements when it issued the $2 million award. On July 28, 1997, the parties stipulated that the court may take judicial notice of the price of GE stock as reported in the Wall Street Journal at any time up until the date of its decision. The stipulation

had the effect of making the court aware of the value of the stock-based assets, including the deferred compensation plans, through the date of dissolution. There is no evidence to support the conclusion that the court ignored this information when it issued the alleged offset. "In determining whether the trial court could reasonably conclude as it did on the evidence before it, every reasonable presumption should be given in favor of the correctness of its action." (Internal quotation marks omitted.) *Charpentier* v. *Charpentier*, 206 Conn. 150, 154–55, 536 A.2d 948 (1988).

The court made extraordinary efforts to ensure that the valuation and the division of the marital property was within the bounds of our statutes, case law and constitution. We will not disturb the court's thoughtful analysis and conclusion, which falls well within the bounds of its broad discretion.

## II

The plaintiff contends that the court improperly divided the General Electric Supplementary Pension Plan by relying on information not supported in the record. We disagree.

When a party challenges the factual findings of a court related to financial awards in a dissolution action, we reverse the court's decision only if those findings are not supported by the evidence or if, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. *Wilkes* v. *Wilkes*, supra, 55 Conn. App. 317; *Rolla* v. *Rolla*, 48 Conn. App. 732, 737–38, 712 A.2d 440, cert. denied, 245 Conn. 921, 717 A.2d 237 (1998).

## A

The plaintiff contends that the court ignored the fact that GE considers an employee's number of years of service, among other factors, when determining the

pension benefit amount and that the court likewise failed to do so when calculating its financial awards.[9] We disagree.

Supplementary pension benefits through GE are calculated using a formula that includes as a factor "annual retirement income" calculated as 1.75 percent of average annual compensation multiplied by the number of years of pension benefit service. This supplementary pension is available only to high level executives of GE and is provided only to the extent that it exceeds moneys due through GE's qualified pension plan benefits.

The court ordered as follows: "The defendant is awarded all the right, title and interest in and to the General Electric Supplementary Pension Plan (nonqualified plan), including whatever 'retirement allowance' payment that may be paid to the defendant by General Electric Corporation. Said supplementary pension plan is payable to a GE executive who has worked for five years immediately prior to his retirement or sixtieth birthday, whichever first occurs. No vesting accrues or service credit accrues for any employment by GE prior to that five year period. . . . As of the last day of trial in February, 1997, the defendant was fifty-four. He has a projected retirement age of sixty-five. Therefore, all GE employment services to be rendered by the defendant in order to become eligible for said GE supplementary pension plan would be postseparation."

The court's findings regarding the supplementary pension plan and its subsequent allocation to the defen-

---

[9] As we discuss, the application of the supplementary pension plan to the parties is affected by the date the defendant retires from GE. The plaintiff's counsel stated at oral argument that it was her belief that he no longer works at GE. The plaintiff's counsel was not aware of the reasons for his termination or, more importantly, the date that he left GE. Given the paucity of information before us, we will address the more complex of the two scenarios and discuss the supplementary pension plan as if the defendant currently is employed at GE.

dant are not clearly erroneous. The court did not focus on the methodology of the pension calculation to establish the appropriate division of assets. Rather, it concentrated on time in which entitlement to the supplementary pension arises, which, at the time of dissolution, had not yet occurred and, assuming that the defendant works until age sixty-five, would occur completely postdissolution. The court ordered that in the event that the defendant retires, dies or otherwise becomes entitled to receive any benefits from the supplementary plan earlier than age sixty-five, and if any of the preceding five years before that time falls before the time of the parties' separation,[10] the plaintiff will receive one-half of an amount determined by using a coverture factor. The court in its memorandum of decision described specific calculations for that contingency.

The supplementary pension plan is geared toward encouraging future performance and allocates benefits according to the last five years of employment or a sixtieth birthday, whichever occurs first. Accordingly, the last five years preceding the end of employment are crucial for determining any payments under this plan. The court properly awarded the plaintiff moneys under the plan only if the defendant retires within five years of the separation date. The court's reduced emphasis on the benefits calculations on the basis of length of service was not improper. As one appeals court noted when criticizing a trial court that held that severance payments awarded after the marriage were distributable because they were calculated on the basis of years of service: "The problem with this analysis is

---

[10] The parties' separation date was December 1, 1995. If the defendant becomes eligible for any supplementary pension benefit prior to December 1, 2000, the plaintiff will receive a portion of that benefit to the extent that any of the last five years of the defendant's employment falls before the separation date.

that it fails to differentiate between entitlement and methodology. . . . The fact that severance pay is calculated based on years of service is of no consequence. This is simply a mathematical device unrelated to the question of the nature of the benefit and when it was earned." *Reinbold* v. *Reinbold,* 311 N.J. Super. 460, 471, 710 A.2d 556 (App. Div. 1998).

Furthermore, contrary to the plaintiff's contentions, we do not subscribe to a "building blocks" theory whereby postdissolution earnings are subject to division because of efforts during the marriage. Here, the service requirements needed to vest the defendant's supplementary pension rights will come to pass only after the plaintiff's marital contributions come to an end. It is widely accepted that assets earned after the end of the marriage are not marital property; *Bornemann* v. *Bornemann,* supra, 245 Conn. 521; and that in many cases, efforts during the marriage regarding an asset do not impose a requirement to earn postmarital income on the basis of that asset. See, e.g., *Simmons* v. *Simmons,* 244 Conn. 158, 170, 708 A.2d 949 (1998) (medical degree earned during marriage not property subject to dissolution). The only value of the supplementary pension during the marriage was "the possibility of the enhanced earning capacity that it might afford sometime in the future. The possibility of future earnings, however, represents a mere expectancy, not a present right." Id.

As the court stated, "Although [the defendant] has worked for GE for more than five consecutive years, it is the last five consecutive years of GE employment that vests the supplemental pension plan." The distinctive feature of the supplementary pension plan is that it does not vest unless the employee retires at or after age sixty. For vesting purposes, it is not relevant whether the executive has worked for GE over the previous five years or the previous fifty years. The last

five years of service are crucial to receiving the supplementary pension plan benefits, and the court focused on this aspect when dividing its assets. We therefore conclude that the court's conclusions on this ground are not improper.

## B

The plaintiff also contends the court failed to consider certain evidence when making its decision. Specifically, the plaintiff argues that the court failed to consider the effect of GE's "for the good of the company" policy regarding retirement on the supplementary retirement plan benefits. The plaintiff also argues that the court did not read a large document, known to the court as exhibit ninety-five, which contained the terms of GE's supplementary pension plan, before issuing its initial orders on December 3, 1997. We disagree.

"The scope of our review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did. . . . It is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses. . . . In determining whether the trial court could reasonably conclude as it did on the evidence before it, every reasonable presumption should be given in favor of the correctness of its action." (Citations omitted; internal quotation marks omitted.) *Leo* v. *Leo*, 197 Conn. 1, 4, 495 A.2d 704 (1985); see *Charpentier* v. *Charpentier*, supra, 206 Conn. 154–55.

The plaintiff first contends that the court impermissibly failed to consider GE's "for the good of the company" policy regarding retirement. Under this policy, if an executive between the ages of fifty and sixty retires "for the good of the company," GE's chairman is authorized to award a retirement allowance that in essence

substitutes for pension benefits lost to early retirement. The plaintiff's assertion is incorrect, as the court addressed this policy in its order regarding the supplementary pension plan. The court stated: "The defendant is awarded all the right, title and interest in and to the General Electric Supplementary Pension Plan (nonqualified plan), *including whatever 'retirement allowance' payment that may be paid to the defendant by General Electric Corporation.*" (Emphasis added.)

The plaintiff next challenges the court's supposed failure to read the terms of the supplementary pension plan before issuing its December 3, 1997 orders regarding dissolution. Sufficient evidence exists that the court reviewed the supplementary pension plan before December 3, 1997. The court's draft opinion as of that date contains references to the supplementary pension plan. Furthermore, the court's full memorandum of decision of March 31, 1998, discusses the plan and directly addresses this issue, stating: "The size of exhibit ninety-five is 461 pages, generally single spaced and often with charts of detailed financial data. . . . The exhibits were read by the court in their entirety . . . ."

We will not perform, as the plaintiff asks us to do, a microscopic examination of the court's use of the evidence before it when issuing a decision. To do so would transform an appellate court into a second trial court, and this we cannot allow. Accordingly, we conclude that the plaintiff's claims here have no merit and that the court did not abuse its discretion.

III

The plaintiff contends that the court improperly excluded passive appreciation from the division of various assets. We disagree.

The plaintiff first asserts that passive appreciation was excluded from various bank and investment

accounts. This claim holds no merit. Even the plaintiff does not dispute that those assets were divided on the basis of their value on the date of dissolution. The plaintiff now complains, without citation to authority, that this was improper because the assets declined in value since the time of trial. The assets apparently declined because both parties incurred expenses during the trial. We find it disingenuous that the plaintiff, who argues so fervently for adherence to the dissolution date throughout this case as the talismanic basis for all decisions, discards that date with rapidity when valuation on that date does not benefit her monetarily.

The plaintiff next argues that she was excluded from the passive appreciation of deferred compensation programs. The court's findings in this area were well within its discretion. The court found that the doubling in value of GE stock since the date of the parties' separation was not due to the plaintiff's efforts. Second, the court remarked extensively on the success of GECS and, indirectly, GE, since the defendant became the chief executive officer of GECS in 1985. The court stated: "It appears from [the 1996 draft annual report of GE and letters to shareholders] the GECS was a small but growing part of a very large company in 1983. It appears that GECS was a large but growing part of a large company in 1996. . . . The growth at GECS demonstrates the results of this twelve year leadership. GECS earnings increased from $271 million in 1983 to $2.81 billion in 1996, a tenfold increase. This is approximately 20 percent compounded annual growth for the last thirteen years. In 1983, GECS was responsible for slightly more than 13 percent of GE's net earnings, and in 1996 that percentage grew to slightly less than 39 percent."

The court further stated: "In an article in the January 13, 1997 issue of the Wall Street Journal, it was noted that GE '[w]hen it reports record 1996 earnings this week, it is likely to emerge as the most profitable com-

pany in the [United States].' . . . GECS appears prominently in the article. GECS 'assets totaled $186 billion at the end of 1995, up 46 percent in two years; if it were a bank, it would have been the third biggest in the [United States]. . . . It is clear to this court that [John E.] Welch [the chief executive officer of General Electric] has made a substantial contribution to the [parties'] assets, clearly more than the plaintiff. As [the chief executive officer] of the equally successful GECS, so did the defendant."

The court stated that even the plaintiff's own valuation expert noted in his report that " '[the defendant] has been employed by GE since 1975, and is currently the chief executive officer of GE Capital and a senior vice president for GE. It has been his efforts in the last ten years that have driven the growth of GECS and resulted in significant improvement in the value of GE stock.' "

The plaintiff in her principal brief makes the baseless assertion that "[t]he evidence before the court and the fact that the defendant was a GE employee did not warrant the court's assumption that [the] defendant was solely responsible for the increase in value of the options on GE stock and other GE provided benefits." Even a cursory glance at the court's lengthy memorandum of decision, as highlighted by the previously quoted statements, reveals that the plaintiff's assertion totally is without merit. The plaintiff does not provide a single citation from the court's decision where it made or even remotely implied this assumption. We therefore conclude that the plaintiff's contentions hold no merit.

IV

The plaintiff contends that the court improperly failed to find that division of marital property pursuant to § 46b-81 should be based on a presumption that each partner to the marriage is entitled to an equal share

and that the absence of such a presumption violates the equal rights amendment (ERA) to our state constitution. See Conn. Const., art. I, § 20. We disagree.

"[A] party who challenges the constitutionality of a statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and we indulge in every presumption in favor of the statute's constitutionality. . . . In addition to showing that [the statute] is unconstitutional beyond a reasonable doubt, [the plaintiff] must show that its effect or impact on [her] adversely affects a constitutionally protected right which [she] has. . . . Finally, [w]hile the courts may declare a statute to be unconstitutional, our power to do this should be exercised with caution, and in no doubtful case." (Citations omitted; internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Voll*, 38 Conn. App. 198, 203, 660 A.2d 358, cert. denied, 235 Conn. 903, 665 A.2d 901 (1995); see *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 44, 699 A.2d 101 (1997). An equal protection challenge must be established by a "showing of intentional or purposeful discrimination." *Golab* v. *New Britain*, 205 Conn. 17, 26, 529 A.2d 1297 (1987). "We are bound to assume that the legislature intended, in enacting a particular law, to achieve its purpose in a manner which is both effective and constitutional." *Moscone* v. *Manson*, 185 Conn. 124, 128, 440 A.2d 848 (1981).

A

The plaintiff contends that the ERA engrafts a presumption onto § 46b-81 that the property be equally divided between the spouses. The plaintiff concedes in her principal brief that "the statutes relating to dissolution provide no baseline or initial presumption from which the court is to operate," and she cannot and does not point to a single Connecticut appellate decision that states, advocates or implies that a fifty-fifty presump-

tion is appropriate. Yet, in spite of this jurisprudential void of support, she in essence argues as follows: The statute does not contain any guidelines on how to apply its criteria. The application is left to judicial discretion. Consequently, the results have been unfair to the economically deprived spouse and, thus, a set rule must be created to right this wrong. We disagree.

We start with the plain meaning of the statute. "It is well settled that a statute must be applied as its words direct." (Internal quotation marks omitted.) *Pascarelli* v. *Moliterno Stone Sales, Inc.*, 44 Conn. App. 397, 400, 689 A.2d 1132, cert. denied, 240 Conn. 926, 692 A.2d 1282 (1997). General Statutes § 46b-81 (c) directs the court to consider numerous separately listed criteria. No language of presumption is contained in the statute.[11] Indeed, § 46b-81 (a) permits the farthest reaches from an equal division as is possible, allowing the court to "assign to either the husband or wife *all* or any part of the estate of the other. . . ." (Emphasis added.) The claimed equal division presumption is not part of the statutory criteria. On the basis of the plain language of § 46b-81, there is no presumption in Connecticut that marital property should be divided equally prior to applying the statutory criteria.

Furthermore, some decisions in other jurisdictions have refused to make a fifty-fifty division of property when requested to do so by litigants. For example, in *Luedke* v. *Luedke*, 487 N.E.2d 133 (Ind. 1985), the Supreme Court of Indiana vacated the opinion of the Court of Appeals and declared that Indiana's distribution statute does not require a fifty-fifty split. Id., 134. The *Luedke* court reasoned that a required fifty-fifty split would "put an artificial structure on the fact-find-

---

[11] Unlike Connecticut, a number of states have decided to place just such a presumption into their marital distribution statutes. See, e.g., W. Va. Code § 48-2-32 (c) (1998); Ohio Rev. Code Ann. § 3105.171 (C) (1) (Baldwin 1995).

ing process which may very well impinge the trial judge's ability to openly weigh all the facts and circumstances, giving equal regard to all of them. . . . [A] complete and thorough examination needs to be made of the quantity and quality of the contribution of both the wage earner and homemaker in order to come to a final determination. The actions of people in the course of daily life are not easily susceptible to mathematical calculation." Id.[12]

Allowing the plaintiff's argument to persuade us would be, in effect, to write a community property law by judicial fiat. See *Fischer* v. *Wirth*, 38 App. Div. 611, 612, 326 N.Y.S.2d 308 (1971) ("[w]hat appellant really seeks is a community property division under the guise of equitable relief"). In sum, in the absence of specific statutory language, there is no presumption of an equal property distribution in Connecticut. "The legislative intent is to be found, not in what the legislature intended to say, but in the meaning of what it did say. . . . We must construe a statute without reference to whether we feel that it might be improved by adding to it or interpreting it differently. . . . It is our duty to apply the law, not to make it." (Citations omitted.) *Commissioner of Administrative Services* v. *Gerace*, 40 Conn. App. 829, 832–33, 673 A.2d 1172 (1996), appeal dismissed, 239 Conn. 791, 686 A.2d 993 (1997). "[I]t is not the province of a court to supply what the legislature chose to omit. The legislature is supreme in the area of legislation, and courts must apply statutory enactments according to their plain terms." (Internal quotation marks omitted.) *Glastonbury Co.* v. *Gillies*, 209 Conn. 175, 181, 550 A.2d 8 (1988). As *Luedke* and the trial court rightly note, the application of this suggested presumption by appellate decree would deprive the trial

---

[12] Subsequent to the decision in *Luedke*, the Indiana legislature enacted into law an equal division presumption. See Ind. Code § 31-1-11.5-11(c); *Kirkman* v. *Kirkman*, 555 N.E.2d 1293, 1294 (Ind. 1990).

court of a substantial portion of its power and discretion. See *State* v. *Corchado*, 200 Conn. 453, 464, 512 A.2d 183 (1986).

"An equitable award does not require that the marital estate be divided equally." *In re Marriage of Petrovich*, 154 Ill. App. 3d 881, 887, 507 N.E.2d 207, appeal denied, 116 Ill. 2d 556, 515 N.E.2d 125 (1987); see also *Avramis* v. *Avramis*, 245 App. Div. 2d 585, 586, 664 N.Y.S.2d 885 (1997); *Guziak* v. *Guziak*, 80 Ohio App. 3d 805, 814, 610 N.E.2d 1135 (1992). The plaintiff has submitted no supported argument that persuades us to create a fifty-fifty presumption of property division in our state. The court properly found that no such presumption exists, and we agree with its conclusion.

### B

The plaintiff also claims that the absence of a fifty-fifty presumption in property distribution matters violates the ERA. We disagree.

As we discussed in part IV of this opinion, "[l]egislation is presumed to be constitutional, and a litigant challenging its validity has the heavy burden to establish its unconstitutionality beyond a reasonable doubt." *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 566, 715 A.2d 46 (1998). The plaintiff concedes, as she has no choice but to do, that Connecticut's property distribution statute, § 46b-81, is gender neutral on its face. Although at one time it did discriminate on the basis of sex; see *Stern* v. *Stern*, 165 Conn. 190, 194, 332 A.2d 78 (1973); these infirmities have long since been cured.

"The equal protection clause does not require absolute equality or precisely equal advantages . . . . Rather, a state may make classifications when enacting or carrying out legislation, but in order to satisfy the equal protection clause the classifications made must

be based on some reasonable ground. . . . To determine whether a particular classification violates the guarantees of equal protection, the court must consider the character of the classification; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. . . . Where the classification impinges upon a fundamental right or impacts upon an inherently suspect group, it will be subjected to strict scrutiny and will be set aside unless it is justified by a compelling state interest. . . . On the other hand, where the classification at issue neither impinges upon a fundamental right nor affects a suspect group it will withstand constitutional attack if the distinction is founded on a rational basis." (Internal quotation marks omitted.) *State* v. *Matos*, 240 Conn. 743, 760–61, 694 A.2d 775 (1997).

The plaintiff also has provided no evidence to support her argument that § 46b-81 disparately impacts women. The court found that "[n]o evidence in this case was offered of de facto discrimination against women by reason of the failure to read a fifty-fifty presumption into the equitable distribution scheme." We agree. Even assuming, arguendo, that the plaintiff could prove that a disparate impact exists, an equal protection challenge cannot be supported on that basis alone. Intentional or purposeful discrimination must be shown to make a successful equal protection challenge. *Golab* v. *New Britain*, supra, 205 Conn. 26.

The plaintiff attempts to transform *Sheff* v. *O'Neill*, 238 Conn. 1, 678 A.2d 1267 (1996) (en banc), into a new pronouncement of law that allows state constitutional challenges on the basis of disparate impact. In *Sheff*, our Supreme Court held that the legislature was required to remedy both de jure and de facto segregation in public schools. Id., 29–30. The court did not intend to allow state constitutional challenges on the basis of disparate impact, and it ruled as it did because it relied in part

on the "independent constitutional significance" of the word "segregation" in article first, § 20, of our state constitution and the affirmative constitutional obligation to provide a substantially equal educational opportunity under article eighth, § 1. Id., 25–30.

Decisions subsequent to *Sheff* reveal that the Supreme Court did not open the door to disparate impact challenges. For instance, the court's ruling in *Shawmut Mortgage Co.* v. *Wheat*, 245 Conn. 744, 717 A.2d 664 (1998), is instructive. In *Shawmut Mortgage Co.*, the defendant challenged General Statutes § 31-228, which provides for foreclosure protection for unemployed persons, but not to individuals who have never been in an employee-employer relationship. *Shawmut Mortgage Co.* v. *Wheat*, supra, 754. The court rejected the equal protection challenge to the statute, reiterated its holding in *Golab* v. *New Britain*, supra, 205 Conn. 26, and concluded that an insufficient record existed to show "that the purpose or intent of the mortgage act is to discriminate." *Shawmut Mortgage Co.* v. *Wheat*, supra, 755 n.9. Therefore, we follow *Shawmut Mortgage Co.* and *Golab*, and conclude that a showing of discriminatory impact alone cannot provide the basis for the plaintiff's constitutional challenge.

The plaintiff also has provided no evidence to support her argument that § 46b-81, without a fifty-fifty presumption of division, possesses discriminatory intent, as *Golab* requires. In its memorandum of decision, the court stated that "[t]he plain language of General Statutes §§ 46b-81 (c) and 46b-82 is gender neutral language and demonstrates no de jure sexual discrimination." The statute is gender neutral on its face and in its intent, and no evidence has been presented to show otherwise. The plaintiff in her principal brief makes the bald assertion that not having a fifty-fifty presumption creates a special exception for wealthy litigants in divorce cases, and allows "an extremely wealthy wage earner to shirk

the responsibilities of equitable division of property [and] would discriminate against the vast majority of lower income divorcing partners in Connecticut."

The mere fact that § 46b-81 is not so specific as to require a fifty-fifty presumption does not render the statute unconstitutional. In *Joy* v. *Joy*, 178 Conn. 254, 255, 423 A.2d 895 (1979), our no fault divorce statute was challenged on the ground that it fails to impose judicial standards or guidelines that limit discretionary fact-finding by trial courts. Id., 256. Our Supreme Court held the statute to be constitutional even though the provision contained no objective guidelines. Id., 255–56. "We decline, as have other courts that have considered the issue . . . to circumscribe this delicate process of fact-finding by imposing the constraint of guidelines on an inquiry that is necessarily individualized and particularized." (Citations omitted.) Id., 255. "The absence of objective guidelines does not mean abdication of judicial function . . . ." Id. Furthermore, in *Lane* v. *Lane*, 187 Conn. 144, 146, 444 A.2d 1377 (1982), our Supreme Court rejected an equal protection claim that was based on the alleged refusal of the trial court to consider the husband's contributions to the support of the family rather than only the wife's contributions. The court rejected this argument, stating "that the trial court considered all relevant factors. The court was not required to recite all of them . . . or make specific findings concerning each." (Citation omitted.) Id.

As the court in this case rightly stated: "The plaintiff would have the decision in this case take its place along with the great events making changes in women's rights: the 1848 Seneca Falls [New York] Convention; the Married Women's Act of 1877 in Connecticut [Public Acts 1877, c. 114, now General Statutes § 46b-36]; the nineteenth amendment to the United States Constitution, ratified in Connecticut on September 14 and 20, 1920; and the ERA to the Connecticut constitution, adopted

November 27, 1974. This historical progression, while compelling, does not warrant the results the plaintiff seeks. The plaintiff seeks, by judicial fiat, to declare unconstitutional, statutes in order to correct an economic disorder." We agree with the court and conclude that the plaintiff has not successfully proven a violation of the ERA.

V

The plaintiff contends that the court improperly relied on sources outside the record. We disagree.

A party may successfully attack a court's conclusions if it is found that the court "relied on matters not in evidence or not properly in evidence as a basis for its conclusions." *Velsmid* v. *Nelson,* 175 Conn. 221, 224, 397 A.2d 113 (1978); *Main* v. *Main,* 17 Conn. App. 670, 675, 555 A.2d 997, cert. denied, 211 Conn. 809, 559 A.2d 1142 (1989).

To illustrate the court's reliance on matters not in evidence as a basis for the court's conclusions, the plaintiff points to a footnote in the memorandum of decision in which the court expresses gratitude for assistance from an individual and various academic institutions.[13] This statement does not articulate the nature of the assistance, the significance of the assistance or whether the assistance directly involved the marriage and assets of the plaintiff or the defendant. Furthermore, the plaintiff does not point to any place where the record is developed on this issue. "It is the appellant's burden to provide an adequate record for review. Practice Book [§ 60-5] . . . . It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court

[13] The court stated: "This court wishes to express thanks to the following for their assistance in the preparation of this memorandum of decision: Villanova University, Harvard University, Princeton University, Bucknell University, Pennsylvania State University and Rose Ann Rush."

has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter." (Internal quotation marks omitted.) *State* v. *Collic*, 55 Conn. App. 196, 209, 738 A.2d 1133 (1999). If a court denies a motion for articulation or merely restates its original decision, the burden remains with the appellant to perfect the record or seek appellate review of the court's response. E.g., *Dime Savings Bank of Wallingford* v. *Cornaglia*, 33 Conn. App. 549, 554–55, 636 A.2d 1370, cert. granted, 229 Conn. 907, 640 A.2d 120 (1994) (appeal withdrawn October 17, 1994). Accordingly, an insufficient record exists to review this claim, and we thus decline to afford review.[14]

## VI

The plaintiff contends that the court improperly excluded evidence and expert testimony relating to the value of termination and severance packages available to executives. We disagree.

"It is well established that the trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Moreover, it is well settled that before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . When determining that issue in a civil case, the standard to be used is whether the erroneous ruling would likely affect the result." (Citations omitted; internal quotation marks omitted.) *New England Sav-*

---

[14] The plaintiff also contends that various references by the court to other high profile divorces was improper. This argument holds no merit. The court stated in its memorandum of decision that those references merely were "examples of spousal contributions to a high asset marriage" and cautioned that "[t]he outcome of one dissolution litigation should not control the outcome of another."

*ings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 752, 680 A.2d 301 (1996); see *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990).

The plaintiff first challenges the court's quashing of a subpoena for the testimony of William Conaty, a GE executive who the plaintiff claims was responsible for negotiating severance packages or other benefits replacements for executives at the defendant's level. The plaintiff's argument spans less than one quarter-page of text in her principal brief, offers no reasoning, presents no citations to authority and does not articulate why the quashing of the subpoena was improper or what harm it caused.[15] "[A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Food Studio, Inc.* v. *Fabiola's*, 56 Conn. App. 858, 864, 747 A.2d 7 (2000). We therefore will not review this part of the plaintiff's claim.

The plaintiff's next challenge focuses on the excluded expert testimony of Perry Anderson, who she claims would have testified about the practices of executive compensation committees in putting together executive benefits packages. The court stated that its rationale, in part, for not permitting Anderson to testify was that the plaintiff had rested her case except for three issues and that Anderson's proffered testimony was not pertinent to those topics. Further, the disclosure of Anderson was belated. The plaintiff has not convinced this court that the trial court's ruling was improper or that it caused the plaintiff any harm at trial that was likely

---

[15] The plaintiff's entire argument on this issue in her briefs to this court is as follows: "[The] [p]laintiff sought to take the deposition or summon to trial William Conaty, a GE executive who had been identified as the one responsible for negotiating severance packages or other benefits replacements for executives at the defendant's level. (Ex 99). The subpoena for that testimony was quashed by the court."

to affect the trial's result. We therefore conclude that the court did not abuse its discretion in excluding Anderson's proffered testimony.

## VII

The plaintiff's final claim involves an accusation that the court improperly exhibited gender bias at trial in favor of the defendant and against the plaintiff. We disagree.

"Accusations of judicial bias or misconduct implicate the basic concepts of a fair trial. . . . The appearance as well as the actuality of [partiality] on the part of the trier will suffice to constitute proof of bias sufficient to warrant disqualification. . . . Canon 3 (c) (1) provides in relevant part: A judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (A) the judge has a personal bias or prejudice concerning a party . . . . *State* v. *Montini*, 52 Conn. App. 682, 694, 730 A.2d 76, cert. denied, 249 Conn. 909, 733 A.2d 227 (1999)." (Internal quotation marks omitted.) *State* v. *Dumas*, 54 Conn. App. 780, 790–91, 739 A.2d 1251, cert. denied, 252 Conn. 903, 743 A.2d 616 (1999).

"To prevail on its claim of a violation of this canon, the plaintiff need not show actual bias. The plaintiff has met [her] burden if [she] can prove that the conduct in question gave rise to a reasonable appearance of impropriety. We use an objective rather than a subjective standard in deciding whether there has been a violation of canon 3 (c) (1). Any conduct that would lead a reasonable [person] knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned is a basis for the judge's disqualification. Thus, an impropriety or the appearance of impropriety . . . that would reasonably lead one to question the judge's impartiality in a given proceeding

clearly falls within the scope of the general standard . . . . The question is not whether the judge is impartial in fact. It is simply whether another, not knowing whether or not the judge is actually impartial, might reasonably question his . . . impartiality, on the basis of all of the circumstances." (Internal quotation marks omitted.) *Abington Ltd. Partnership* v. *Heublein,* 246 Conn. 815, 819–20, 717 A.2d 1232 (1998); *Dubaldo* v. *Dubaldo,* 14 Conn. App. 645, 649, 542 A.2d 750 (1988).

Of course, "[g]ender bias, particularly bias based on stereotypes, has no place in the courtroom." (Internal quotation marks omitted.) *State* v. *Figueroa,* 235 Conn. 145, 185, 665 A.2d 63 (1995). The plaintiff points to various events that she believes constitute gender bias against her. First, the court denied her motions seeking to limit the defendant's freedom to transfer assets. Second, the court awarded her an allegedly insufficient portion of the defendant's long-term performance award. Third, the court refused to grant her exclusive possession of the marital home. Fourth, the court refused to recognize, in the plaintiff's words, that "the marriage relationship is a partnership of equals similar to an economic partnership."

Rather than raise these claims of alleged bias at the time of their occurrence, the plaintiff decided to wait nearly one year after the trial was completed to make these challenges. "Claims alleging judicial bias should be raised at trial by a motion for disqualification or the claim will be deemed to be waived. *Barca* v. *Barca,* [15 Conn. App. 604, 607, 546 A.2d 887, cert. denied, 209 Conn. 824, 552 A.2d 430 (1988)]. A party's failure to raise a claim of disqualification at trial has been characterized as the functional equivalent of consenting to the judge's presence at trial. *Timm* v. *Timm,* 195 Conn. 202, 205, 487 A.2d 191 (1985)." (Internal quotation marks omitted.) *Churchill* v. *Allessio,* 51 Conn. App. 24, 38,

719 A.2d 913, cert. denied, 247 Conn. 951, 723 A.2d 324 (1998); see Practice Book § 997, now § 1-23.

The plaintiff's delay in raising her claims stems from little more than an attempt to manufacture cause for remand. "Our Supreme Court has criticized the practice whereby an attorney, cognizant of circumstances giving rise to an objection before or during trial, waits until after an unfavorable judgment to raise the issue. We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." (Internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 543, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999), citing *Timm* v. *Timm*, supra, 195 Conn. 205. On these grounds alone the plaintiff's claims of bias must fail.

Given the grave nature of the plaintiff's accusation, we also must address it in substance. "Of all the charges that might be leveled against one sworn to 'administer justice' and to 'faithfully and impartially discharge and perform all the duties incumbent upon me' . . . a charge of bias must be deemed at or near the very top in seriousness, for bias kills the very soul of judging— fairness." (Citation omitted.) *Pac-Tec, Inc.* v. *Amerace Corp.*, 903 F.2d 796, 802 (Fed. Cir. 1990), cert. denied sub nom. *Perry* v. *Amerace Corp.*, 502 U.S. 808, 112 S. Ct. 49, 116 L. Ed. 2d 27 (1991).

In *Evans* v. *Commissioner of Correction*, 37 Conn. App. 672, 676–77 n.6, 657 A.2d 1115, cert. denied, 234 Conn. 912, 660 A.2d 354 (1995), we cautioned a litigant, who questioned whether a habeas judge had read certain materials, against even the inadvertent casting of aspersions on the habeas court. Even though counsel in *Evans* stated at oral argument that she did not intend

to challenge the integrity of the court, we stated that "[w]e caution counsel against making statements not intended to question the court's integrity but that might be construed in that manner." Id.

In this case, the plaintiff's counsel not only ignores our warning in *Evans*, but crosses the invisible line delineating ethical and unethical conduct. Unlike counsel in *Evans*, her attack is by no means inadvertent, but a direct, groundless assault on the integrity of the trial court.

It is an elementary rule of law that the "fact that a trial court rules adversely to a litigant, even if some of these rulings were to be determined on appeal to have been erroneous, does not demonstrate personal bias." *Bieluch* v. *Bieluch*, 199 Conn. 550, 553, 509 A.2d 8 (1986); see *State* v. *Fullwood*, 194 Conn. 573, 582, 484 A.2d 435 (1984); *Hartford Federal Savings & Loan Assn.* v. *Tucker*, 192 Conn. 1, 8, 469 A.2d 778 (1984); *State* v. *Fuller*, 56 Conn. App. 592, 627 n.34, 744 A.2d 931, cert. denied, 252 Conn. 949, 748 A.2d 298 (2000).

The plaintiff's own trial pleadings reveal that her counsel knew or should have known that there were no good grounds to support this challenge. Practice Book § 997, now § 1-23, provides that "[a] motion to disqualify a judicial authority shall be in writing and *shall be accompanied by an affidavit setting forth the facts relied upon to show the grounds for disqualification* and a certificate of the counsel of record that the motion is made in good faith. . . ." We have noted that "[t]his provision creates a mandatory procedure to be followed by any party seeking to recuse a judge." *State* v. *Weber*, 6 Conn. App. 407, 412, 505 A.2d 1266, cert. denied, 199 Conn. 810, 508 A.2d 771 (1986).

Although the plaintiff's counsel did file an affidavit as required by Practice Book § 997, now § 1-23, this procedure was followed in form only. The affidavit is

three paragraphs in length and contains no facts supporting the demand for disqualification. The plaintiff states in her affidavit little more than that she read the motion and that its facts are true. Indeed, the court criticized the motion on similar grounds, stating: "The affidavit of facts is merely conclusionary, signed by [the plaintiff]. There is insufficient affidavit of facts. It just says that I have read the enclosed motion, which does have a section of facts, but she does not indicate affidavit of facts. That on its own is sufficient to deny the motion to disqualify."

On appeal, the plaintiff's counsel fares no better. Her appeal does not point to a single fact that tends to show bias by the court. When questioned by this court at oral argument, the plaintiff's counsel again failed to point to a single supporting factual ground. In short, the plaintiff's efforts to raise the charge of bias against the trial court have been repeatedly made with absolutely no foundation whatsoever, both at trial and on appeal.

Other courts, when presented with a similar groundless attack, have not hesitated to reject claims of judicial bias when such claims prove utterly without support. E.g., *Undersea Engineering & Construction Co.* v. *International Telephone & Telegraph Corp.*, 429 F.2d 543, 545 (9th Cir. 1970) (motion to disqualify trial court "frivolous, if not groundless and vexatious"), overruled in part on other grounds, *Avery* v. *United States*, 829 F.2d 817, 818–19 (9th Cir. 1987); *Stephen* v. *Antigua Brewery, Ltd.*, 88 F. Sup. 2d 422, 424 (D. Virgin Islands 2000) (rejecting claims of judicial bias as "grave, unfounded accusations"). Some courts award costs to the party forced to defend the groundless charge on appeal. E.g., *Porter* v. *Metrowest Automotive Resources, Inc.*, 2000 Mass. App. Div. 129, 131 (Dist. Ct. 2000) (defendant's accusation that trial court biased against all used car sales companies "devoid of merit," and plaintiff entitled to costs of appeal).

Although sanctions ultimately were not imposed in *United States* v. *Brown*, 72 F.3d 25 (5th Cir. 1995), the facts of that case are instructive. In *Brown*, the defendant's attorney, Paul Kidd, challenged the District Court's handling of his client's criminal trial. Id., 27. Kidd filed a memorandum of law in which he made general accusations of bias by the judge against his client and in favor of the prosecution. Id. When pressed by the District Court for specifics, Kidd provided fourteen excerpts from the trial transcript that "largely [involved] instances in which the trial court sustained objections by the government during defense counsel's cross-examination." Id. The District Court found that Kidd had violated rule 8.2 of the Rules of Professional Conduct, fined him $5000 and suspended him for one year from the practice of law. Id., 28.

The United States Court of Appeals for the Fifth Circuit reversed the District Court's imposition of sanctions, reasoning in part that Kidd's accusations did not rise to the level of dishonesty and corruption necessary to warrant sanctions. Id., 29–30. As with the attorney in *Brown*, the plaintiff's counsel in this case can point to no more than adverse rulings to support her claim of bias. "Adverse rulings do not themselves constitute evidence of bias." *State* v. *Fullwood*, supra, 194 Conn. 582; *Hartford Federal Savings & Loan Assn.* v. *Tucker*, supra, 192 Conn. 8; see *Bieluch* v. *Bieluch*, supra, 199 Conn. 553; *State* v. *Fuller*, supra, 56 Conn. App. 627 n.34. We note that *Brown* and other cited cases are relevant for the seriousness with which courts take these charges and provide a cautionary warning for any member the bar who may in the future consider making such an unsupported line of attack.

The plaintiff's efforts to smear the court with charges of gender bias have absolutely no foundation whatsoever. The plaintiff has failed to provide a single shred of evidence showing gender bias or even an inference

or the appearance of gender bias by the court. We suggest that the plaintiff's counsel review rule 3.1 of the Rules Professional Conduct, which states that a lawyer shall not bring a frivolous claim, and rule 8.2 of the Rules of Professional Conduct, which states that "[a] lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge . . . ." "The lawyer codes express a special obligation not to criticize judges through false accusations . . . ." C. Wolfram, Modern Legal Ethics (1986) § 11.3.2, p. 601. Raising the specter of judicial bias should not be used, as it is here, as a last resort argument to resurrect a losing appeal or to manufacture cause for remand.

In sum, a charge of gender bias against a trial judge in the execution of his or her duties is a most grave accusation. It strikes at the heart of the judiciary as a neutral and fair arbiter of disputes for our citizenry. Such an attack travels far beyond merely advocating that a trial judge ruled incorrectly as a matter of law or as to a finding of fact, as is the procedure in appellate practice. A judge's personal integrity and ability to serve are thrown into question, placing a stain on the court that cannot easily be erased.

"Attorneys should be free to challenge, in appropriate legal proceedings, a court's perceived partiality without the court misconstruing such a challenge as an assault on the integrity of the court. Such challenges should, however, be made only when substantiated by the trial record." *United States* v. *Brown,* supra, 72 F.3d 29. In this case, the plaintiff's challenge is completely unsubstantiated by the trial record.

The judgment is affirmed.

In this opinion the other judges concurred.